# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE MINDBODY, INC., STOCKHOLDER LITIGATION | ) ) | CONSOLIDATED C.A. No. 2019-0442-KSJM |

## POST-TRIAL MEMORANDUM OPINION

Submitted: July 28, 2022
Dated: March 15, 2023

Joel Friedlander, Jeffrey M. Gorris, Christopher M. Foulds, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Gregory V. Varallo, Andrew E. Blumberg, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Jeroen van Kwawegen, Christopher J. Orrico, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Co-Lead Counsel for Lead Plaintiffs and Petitioners Luxor Capital Partners, L.P., Luxor Partners Offshore Master Fund, LP, Luxor Wavefront, LP, and Lugard Road Capital Master Fund, LP.*

Lisa A. Schmidt, Robert L. Burns, Matthew D. Perri, John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A, Wilmington, Delaware; Matthew Solum, P.C., John Del Monaco, Jeffrey R. Goldfine, KIRKLAND & ELLIS LLP, New York, New York; *Counsel for Defendants Richard Stollmeyer, Vista Equity Partners Management, LLC, Torreys Parent, LLC, and Torreys Merger Sub, Inc., and Respondent Mindbody, Inc.*

**McCORMICK, C.**

This case arises from the 2019 acquisition of Mindbody, Inc. ("Mindbody" or the "Company") by Vista Equity Partners Management, LLC ("Vista") for $36.50 per share (the "Merger"). The story begins in 2018, when Mindbody's visionary founder, Richard Stollmeyer, had grown frustrated with his inability to monetize his holdings of Mindbody stock, fearful of the volatility and fickleness of the public markets, and uncertain about his ability to lead Mindbody through its next stage of its growth. A sale of the Company would solve his problems, and Stollmeyer decided it was a good time to sell.

Regrettably, Stollmeyer set the sale process in motion largely without the involvement or knowledge of the Company's board of directors (the "Board"). In August 2018, Stollmeyer met with a banker that had close relationships with multiple private equity firms. The banker immediately introduced Stollmeyer to one of those firms, Vista. Stollmeyer met with Vista shortly after and told Vista that he was looking for a "good home" for his company and its management team. He later accepted Vista's invitation to attend the "CXO Summit" for CEOs of ex-public companies (hence "CXO") that Vista had acquired. At the summit, Vista made presentations advertising the immense wealth that CXOs had achieved by selling to and working for Vista. During the summit, Stollmeyer texted another Mindbody executive about his "mind blowing" experience and that he "loved" Vista. Stollmeyer quickly came to believe that selling to Vista gave him the unique opportunity to both gain liquidity and remain as CEO in pursuit of post-acquisition equity-based upside.

After the Vista conference, Stollmeyer's focus seemed to shift. He no longer was interested in just any sale of the Company. He wanted to sell to Vista. And Stollmeyer let Vista know what he wanted. Vista responded by expressing interest in buying Mindbody.

Vista's *modus operandi* is speed. Vista leverages its ability to move quickly from an expression of interest, through confirmatory diligence, to a firm offer, thereby truncating the process and reducing interloper risk. Vista calls it "sprinting," and for Vista, that's good business. For a target company seeking to maximize stockholder value, however, a truncated timeline can present challenges. It takes time to develop alternatives to promote competition and extract the best price. By sprinting to the finish line, Vista seeks to prevent a target company from doing that.

Shortly after the CXO Summit and before Vista sent its expression of interest, the banker who introduced Stollmeyer to Vista warned him about the firm's need for speed and the risks of rushing a sale process. In response to this advice, Stollmeyer did not adequately involve the Board or erect, much less adhere, to speed bumps to ensure a value-maximizing process. Rather, Vista-smitten Stollmeyer effectively greased the wheels for Vista by stalling the Board process.

Vista's expression of interest came in on a Monday. Stollmeyer sent an email to his management team on a Wednesday telling them not to fear for their jobs and to let Stollmeyer "socialize" the topic with the Board. On Thursday, Stollmeyer spoke for an hour with Eric Liaw, the director representative of Institutional Venture Partners XIII, L.P. ("IVP"). IVP was Mindbody's largest stockholder, and for reasons of its own, IVP wanted a near-term exit. Stollmeyer checked Vista's references on Friday. Meanwhile, Vista

accelerated to deal velocity, contracted for a detailed market study, and put itself in a position to make a firm offer long before other bidders could react.

It was not until the following week that Stollmeyer started dribbling out messages about Vista's expression of interest to the other Board members. Unaware of the full extent of Stollmeyer and Vista's courtship, the Board did not form a transaction committee to consider running a sale process until two weeks later. Stollmeyer asked Liaw to chair the committee, and when Liaw began playing a leadership role, the other directors accepted his leadership without discussing or voting on who would serve as chair. Liaw lobbied for the committee to hire the same banker who had already introduced Stollmeyer to Vista, which it did.

To its credit, the transaction committee established guidelines to cabin management's communications with potential bidders, but Stollmeyer ignored them and tipped Vista that a formal sale process was beginning. And the banker tipped Vista as to Stollmeyer's target price. By the time the committee had authorized its banker to contact financial bidders, Vista was poised to pounce.

In response to the banker's outreach, Vista made a firm offer. The Board asked other bidders to respond promptly with best-and-final offers of their own, but they were still in the early stages of their work and could not respond within that timeframe. The committee countered, and Vista raised its final bid to $1 per share below where its deal team thought the deal price would land. Rather than making another counter, the Board approved it.

The plaintiffs are entities affiliated with Luxor Capital Partners, L.P. (collectively "Luxor' or "Plaintiffs").[1] Those entities own the second largest block of Mindbody stock. They filed this action on behalf of a class of Mindbody's stockholders.[2] They claim that Stollmeyer and the other Board members breached their fiduciary obligations in connection with the Merger and that Vista aided and abetted those breaches. By the time of trial, all of the defendants except Stollmeyer and Vista had either settled or been dismissed. Plaintiffs tried their claims against Stollmeyer and Vista (together, "Defendants").

Plaintiffs advance two main theories of breach. The first is that Stollmeyer breached his fiduciary duties by tilting the process in favor of Vista. The second is that Stollmeyer committed disclosure violations by failing to disclose facts about the sale process and omitting information concerning Mindbody's actual revenue results.

The facts of this case offer multiple analytical frameworks to choose from. The parties agree that one possible framework is enhanced scrutiny under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc*.[3] Under that standard of review, Stollmeyer loses. He did not strive in good faith to pursue the best transaction reasonably available. He instead pursued a fast sale to Vista to further his personal interests. Because he tilted the

---

[1] Plaintiffs are Luxor Capital Partners, L.P., Luxor Partners Offshore Master Fund, LP, Luxor Wavefront, LP, and Lugard Road Capital Master Fund, LP.

[2] Luxor also petitioned for appraisal and litigated the appraisal claim in parallel with the breach of fiduciary duty claims. This decision does not resolve Luxor's claim for appraisal.

[3] 506 A.2d 173 (Del. 1986).

4

sale process in Vista's favor for personal reasons, the process did not achieve a result that falls within the range of reasonableness.

As a remedy, Plaintiffs seek the lost transaction price that Vista would have paid if the process had not been tilted in its favor. Plaintiffs peg that figure at $40 per share. This decision accepts Plaintiffs' theory of liability but rejects the evidentiary basis for a $40 per share figure. The record demonstrates that Vista would have paid $37.50 per share. Stollmeyer is therefore liable for $1 per share.

In contrast to Stollmeyer, Vista prevails on the sale-process claim, but only because of a procedural foot fault. Plaintiffs failed to assert a claim against Vista for aiding and abetting in the sale-process breaches until trial. Plaintiffs tried to fix their error through a motion to amend the pleadings to conform to the evidence presented at the close of trial, but to grant that motion would be prejudicial to Vista.

On the disclosure claim, however, Plaintiffs prevail against both Stollmeyer and Vista. Plaintiffs proved that Stollmeyer breached his duty of disclosure. He failed to disclose the full extent of his involvement with Vista, which was a material omission. Plaintiffs proved that Vista aided and abetted Stollmeyer's breach by failing to correct the proxy materials to include a full and fair description of its own interactions with Stollmeyer. Vista was contractually obligated to review the proxy materials and inform the Company if there were material omissions from the proxy materials. The record shows that Vista personnel who interacted with Stollmeyer reviewed the proxy materials. Vista knew about its own interactions, and it was evident that Stollmeyer was not disclosing them. Vista knowingly participated in the breach by not speaking up.

5

As a remedy for the disclosure claims, Plaintiffs seek compensatory damages calculated using a quasi-appraisal methodology. That remedy, however, requires proof of reliance and causation, which Plaintiffs made no effort to demonstrate. Plaintiffs, therefore, are only entitled to nominal damages as a remedy.

To set nominal damages, this decision turns to a venerated authority—*Weinberger v. UOP, Inc.*[4] There, Chancellor Brown encountered similar difficulty in compensating the minority stockholders for an obvious wrong when there was no mathematical basis for deriving a damages figure. He reasoned that "equity will not suffer a wrong without a remedy."[5] The facts of that case demonstrated that the acquirer would have paid at least $1 more for the target, and at that price, the transaction still would be profitable for the acquirer. Engaging in a classic exercise of equitable discretion, he awarded nominal damages in the amount of $1 per share.

Similar case-specific factors warrant the same relief here. The record demonstrates that Vista had authority to bid up to $40 per share, but that figure was a stretch. Internal Vista communications show that Vista was prepared to increase its bid to $37.50 per share, and the most senior person on the deal team predicted that the bidding would end at that price. Vista's modeling demonstrates that a deal at that price remained profitable for Vista. As in *Weinberger*, the court exercises its equitable discretion to award damages of $1 per

---

[4] 1985 WL 11546 (Del. Ch. Jan. 30, 1985), *aff'd sub nom. Weinberger v. UOP, Inc.*, 497 A.2d 792 (Del. 1985).

[5] *Id.* at *9.

6

share for the disclosure violations. Stollmeyer and Vista are jointly and severally liable for the resulting amount.

Plaintiffs are only entitled to one recovery. It makes no difference whether Stollmeyer pays $1 per share in damages for the sale-process claims, or whether Stollmeyer and Vista pay $1 per share in damages for the disclosure claims.

Plaintiffs are awarded pre- and post-judgment interest at the legal rate, compounded monthly, with the rate varying with changes in the reference rate. Plaintiffs are awarded costs as the prevailing party.

## I.    FACTUAL BACKGROUND

The record comprises 1,865 joint trial exhibits, trial testimony from eighteen fact and six expert witnesses, deposition testimony from twenty-four fact witnesses, and 123 stipulations of fact in the pre-trial order.[6] These are the facts as the court finds them after trial.

---

[6] C.A. No. 2019-0442-KSJM, Docket ("Dkt.") 492, Joint Schedule of Evid.; Dkt. 445, Pre-Trial Stipulation and Order ("PTO"). This decision cites to trial exhibits (by "JX" number); the trial transcript, Dkts. 461–68 (by "Trial Tr. at" page, line, and witness); the post-trial oral argument, Dkt. 493 (by "Post-Trial Oral Arg. Tr. at" page and line); and the deposition transcripts of Dominic Calvani, Christopher Cernich (expert), Jeffrey Chang, Court Cunningham, Jamie d'Almeida (expert), Daniel Fischel (expert), Doug Friedman, Gail Goodman, David Handler, Craig Heinle, Cipora Herman, Michael Kass, Derek Klomhaus, Christian Leone, Eric Liaw, Kimberly Lytikainen, Michael Mansbach, Kevin Murphy (expert), Drew Pascarella (expert), Monti Saroya, Brian Sheth, Graham Smith, Nicolas Stahl, Richard Stollmeyer, Vista Equity Partners LLC (30(b)(6)), and Brett White (by the deponent's last name and "Dep. Tr. at" page and line).

## A. Setting The Stage

Mindbody founder Stollmeyer is the key protagonist in this drama. Stollmeyer is an impressive person. He started his business career as a child helping in his parents' retail lighting fixture store.[7] He attended the United States Naval Academy and served as a nuclear submarine officer for six years after graduation.[8] He next landed a position as a program manager at Vandenberg Air Force Base, which took him to California's Central Coast.[9]

In the mid-1990s, a friend showed Stollmeyer software he had written to support owners of yoga, Pilates, and spinning studios.[10] This software inspired Stollmeyer to launch Mindbody with his friend.[11] By fall 2000, Stollmeyer "leapt off a cliff," in his words, by quitting his engineering job and taking out a second mortgage to start Mindbody in his garage in San Luis Obispo.[12]

From these humble beginnings, Stollmeyer grew Mindbody into a software-as-a-service ("SaaS") platform that serves the fitness, wellness, and beauty industry. Stollmeyer took Mindbody public in 2015.[13]

---

[7] Trial Tr. at 336:22–337:9 (Stollmeyer).

[8] *Id.* at 337:22–338:16 (Stollmeyer).

[9] *Id.* at 338:17–339:3 (Stollmeyer).

[10] *Id.* at 339:13–17 (Stollmeyer).

[11] *Id.* at 339:7–340:15 (Stollmeyer).

[12] *Id.* at 340:2–18 (Stollmeyer).

[13] PTO ¶ 89.

### 1.  Stollmeyer Is Ready To Sell.

By 2018, Stollmeyer had grown Mindbody to over $1 billion market capitalization, yet Stollmeyer had never experienced a big liquidity event.[14]  And he had made substantial financial commitments in the meantime.  Stollmeyer had (i) invested nearly $1 million into his wife's wellness company, (ii) invested at least $300,000 into "Stollmeyer Technologies, LLC," (iii) loaned his brothers and his former business partner money for their own real estate purchases, and (iv) pledged $3 million to a local college, of which $2.4 million was unpaid.[15]

Stollmeyer described his unhappiness with his pre-Merger financial situation in a post-Merger interview for Alejandro Cremades's "dealmakers" podcast.[16]  During the interview, Stollmeyer described how "98% of [his] net worth" was "locked inside" Mindbody's "extremely volatile" stock, while Stollmeyer could only sell "tiny bits" of his stake in the public market under his 10b5-1 plan.[17]  Stollmeyer described those sales as "kind of like sucking through a very small straw":

> [F]or the entrepreneur or particularly for the CEO, [an IPO] is not a liquidity event.  Your capital is locked inside the business, and you can sell tiny bits of it, called the 10b5-1 plan where you decide essentially a year in advance, a couple of quarters in advance, you come up with a plan that says sell off a little bit on these predefined dates.  It doesn't matter if the stock got hammered, it doesn't matter if the stock's high.  So, it's kind

---

[14] *See* JX-1441 at 10 ("[F]or the entrepreneur or particularly for the CEO, [an IPO] is not a liquidity event.").

[15] JX-1142 at 2; Dkt. 474 ("Defs.' Demonstrative 12") at 1–2.

[16] JX-1441.

[17] *Id.* at 10.

of like sucking through a very small straw. For me, I had been at it for a long time. . . .

We were public in 2015, so I'd been at it for 15 years. We would have public investors. I would have them challenge me that I was selling my own stock, and he was like, "Don't you believe in your own company, Rick?" 98% of my net worth is in the stock of my company, which is extremely volatile. I'm in my 50s now, and I've got kids in college. What kind of question is that?[18]

In February 2018, Stollmeyer asked his financial advisor to "estimate [his] cash position" in light of his impending expenses.[19] Stollmeyer stated that the timing and amount of his 10b5-1 sales were "top of mind" because of "greater than expected H1 cash outlays[.]"[20] To meet his commitments, Stollmeyer had to "dig[] into [his] LOC [line of credit]."[21]

Stollmeyer made similar statements in his book on building a wellness business, which was published in 2021 while this litigation was pending.[22] In a chapter about early financing, he described his efforts to obtain money for Mindbody from family and friends, and then referenced his own experience "contributing a significant portion of the cash needed to help my nephew, wife, and son start their own businesses."[23] Stollmeyer also

---

[18] *Id.*

[19] JX-145 at 1.

[20] *Id.*

[21] *Id.*

[22] JX-1647 (titled *Building a Wellness Business That Lasts*).

[23] *Id.* at 183.

10

explained that completing the $1.9 billion Merger "doesn't make me a billionaire."[24] He, nevertheless, took "great pleasure" in knowing that "after many years of living at or near the precipice of financial ruin, my family and I don't have to worry about money anymore."[25]

At trial, Stollmeyer denied that he needed liquidity in early 2018.[26] To bolster his testimony, Stollmeyer introduced testimony from his financial advisor and from an expert on executive compensation.[27] The financial advisor claimed that Stollmeyer had never expressed concerns about liquidity pressures that would require him to sell off his entire Mindbody stake.[28] The executive compensation expert reviewed Stollmeyer's financial decisions during the five years preceding the Merger and opined that Stollmeyer did not seem to be in need of liquidity.[29] He conceded that Stollmeyer faced significant cash demands in the period leading up to the Merger.[30] Both the expert and Stollmeyer's financial advisor acknowledged that Stollmeyer frequently relied on a line of credit to pay expenses.[31]

---

[24] *Id.* at 181.

[25] *Id.*

[26] Trial Tr. at 486:7–20 (Stollmeyer).

[27] *Id.* at 240:10–241:5 (Calvani); *id.* at 1813:16–1814:1 (Murphy).

[28] *Id.* at 238:5–24 (Calvani).

[29] *Id.* at 1821:18–1823:17 (Murphy).

[30] *Id.* at 1843:12–1849:19 (Murphy).

[31] *Id.* at 226:16–227:4 (Calvani); *id.* at 1813:3–5 (Murphy).

Ultimately, Stollmeyer's own pre-litigation and intra-litigation statements reflecting his personal and financial circumstances are far more persuasive than the trial testimony of Stollmeyer or the other witnesses. Stollmeyer said it himself: He was tired. He was tired of "sucking through a very small straw." He was ready to sell.

And 2018 seemed the time to do it. One reason was that Stollmeyer held shares of super-voting Class B stock that would automatically convert to shares of common stock in October 2021.[32] As of 2018, those shares enabled Stollmeyer to control 19.8% of Mindbody's fully diluted voting power, giving him the second largest block of votes.[33] After October 2021, those same shares would carry less than 4% of the Company's fully diluted voting power.[34] Tactically, it was best to for Stollmeyer to move before the sunset loomed, so that another party seeking to neutralize his influence did not try to wait him out.

Another reason, discussed more below, was that Mindbody's largest stockholder—IVP—faced the same sunset provision and was looking to exit.[35] If that happened, then the Board seat held by Liaw would likely transition to a representative from Luxor. Stollmeyer had spoken with both firms. He knew that IVP wanted a near-term sale, while Luxor did not.[36] It behooved Stollmeyer to strike while his major ally also held a position of power.

---

[32] PTO ¶ 70.

[33] *Id.*

[34] *Id.* ¶¶ 70, 77; JX-1138 at 90.

[35] PTO ¶¶ 70, 77.

[36] Trial Tr. at 33:1–34:7 (Friedman).

Additionally, Stollmeyer was exhausted by the struggles that Mindbody faced during 2018. The Company made two strategic acquisitions at the beginning of the year: FitMetrix, a company that integrated workout equipment and wearable fitness trackers with performance feedback technology, and Booker, a cloud-based business management company for salons and spas.[37] Mindbody also shifted its sales strategy to focus on high-value customers.[38] In addition to integrating the acquisitions and reorienting the sales strategy, Stollmeyer was simultaneously serving as the CEO and CTO of Mindbody after the Board terminated the CTO in April.[39] During trial, Stollmeyer testified at length about the difficulties he faced.[40] He stated that by late 2018, he was "physically and emotionally exhausted[.]"[41] Understandably, he wanted out.

### 2. Mindbody's Largest Stockholder Is Ready To Sell.

In 2018, the Company's largest stockholder was IVP, a venture capital investor that had held Mindbody super-voting Class B stock shares since the Company's IPO in 2015.[42] Through a combination of super-voting Class B stock and regular Class A stock, IVP held shares carrying approximately 24.6% of the Company's voting power.[43] Together, IVP

---

[37] PTO ¶ 90.

[38] JX-293 at 105; Trial Tr. at 51:1–17 (Friedman); *id.* at 1991:10–20 (White).

[39] Trial Tr. at 359:21–360:14 (Stollmeyer).

[40] *Id.* at 669:18–22 (Stollmeyer); *see also id.* at 1991:10–1992:17 (White).

[41] *Id.* at 364:12–22 (Stollmeyer).

[42] JX-1138 at 90 (showing IVP's holdings in Mindbody Class A and Class B shares); PTO ¶ 77; Trial Tr. at 1401:2–13 (Liaw).

[43] PTO ¶ 77.

and Stollmeyer controlled over 44% of the Company's voting power.[44] After October 2021, however, the Class B stock would automatically convert into Class A, and IVP's share of the Company's fully diluted voting power would fall to 6%.[45]

Liaw served as IVP's representative on the Board. No other institutional investors enjoyed representation on the Board.[46]

Liaw was one of IVP's eight general partners and thus owed fiduciary duties to IVP. That meant that if IVP wanted a near-term sale, then Liaw had a fiduciary duty to IVP and its investors to pursue a near-term sale. But if a near-term sale was not in the best interests of the Company, then Liaw also had a fiduciary duty as a director of the Company not to pursue a near-term sale. Liaw's position was rife with the potential for conflict.

In March 2018, Liaw emailed Stollmeyer that IVP "may be contemplating a disposition" of its Mindbody stock.[47] IVP had internal reasons to exit. By August 2018, IVP's position in Mindbody reflected an unrealized gain of $68 million.[48] During a meeting on August 13, IVP's partners "agreed to target at least $200M in additional liquidity by year end."[49] Mindbody was listed as one of five positions that would contribute

---

[44] *Id.* ¶¶ 70, 77.

[45] JX-1138.

[46] Trial Tr. at 1394:9–13 (Liaw).

[47] JX-153.

[48] JX-224 at 1; Trial Tr. at 1499:4–22 (Liaw).

[49] JX-236 at 2.

to meeting this goal, and Liaw was directed to "evaluate/recommend evaluate [*sic*] distributing 50% of position by 12/15[.]"[50]

### 3. The Other Mindbody Directors

In addition to Stollmeyer and Liaw, there were six other members of the Board: Katherine Blair Christie, Court Cunningham, Gail Goodman, Cipora Herman, Adam Miller, and Graham Smith.[51]

Christie had served in multiple C-suite positions, including as Chief Development Officer at Landit Inc. and Chief Marketing Officer at Cisco Systems, Inc.[52] She had also been a director of museums, institutes, and societies.[53] She had not served on the board of any other for-profit company and had no experience with a sale process.[54]

Cunningham had been an executive officer of several private companies, including as CEO of Yodle Inc.[55] Cunningham participated in the sales process for Yodle in 2016 to Web.com.[56] Cunningham had also served two other private company boards.[57]

---

[50] *Id.*

[51] PTO ¶ 79.

[52] JX-1483 at 1–2.

[53] *Id.* at 3.

[54] *Id.* at 1.

[55] JX-1482 at 1; Trial Tr. at 875:16–876:9 (Cunningham).

[56] Trial Tr. at 875:16–876:9 (Cunningham).

[57] JX-1482 at 1.

15

Cunningham had not served on any public company board aside from Mindbody and had no experience selling a public company.[58]

Herman had been the Vice President of Finance during Facebook's early years and stayed with that company through its IPO.[59] Herman then served as the CFO for the San Francisco 49ers and the CFO for the Los Angeles 2028 Olympic Games Committee.[60] Herman had not served on the board of any public company before Mindbody and had no experience selling a public company.[61]

Miller founded and served as CEO, President, and director of Cornerstone OnDemand, Inc., which he took public.[62] He had no experience selling a public company.[63]

Smith had been CFO of large software companies, including Salesforce, Advent Software, and Vitria.[64] He had also served on the boards of several public companies that specialized in software.[65] He had no experience selling a public company.

Goodman was the lead independent director of Mindbody at the time of the sale process and the only director with experience selling a public company.[66] She had served

---

[58] *Id.*

[59] Trial Tr. at 1870:14–1872:19 (Herman).

[60] *Id.* at 1870:14–1872:19 (Herman).

[61] *Id.* at 1874:12–14 (Herman).

[62] JX-168 at 15.

[63] *Id.*

[64] Trial Tr. at 2155:5–9 (Smith).

[65] *Id.* at 2154:7–2155:3 (Smith).

[66] *Id.* at 1285:4–18 (Goodman).

16

as the president and CEO of a publicly traded online marketing and SaaS company for over 15 years, and she participated in the sale of that company to Endurance International for $1 billion.[67]

#### 4. Mindbody's Prospects

The directors testified that when Mindbody embarked on its sale process, they viewed its prospects as highly uncertain for many reasons.

For starters, the integration of FitMetrix and Booker had been rocky. Herman recalled participating in a Q2 2018 guide-down based on a reduction in sales productivity "during this integration period."[68] The Company's CFO Brett White testified that the investments were underperforming.[69] In contemporaneous statements to the Board and the Company's investors, however, Stollmeyer expressed optimism about these investments. At Mindbody's annual analyst conference in September 2018, he declared in his presentation slides that "The Integration is Working."[70] Goodman also believed the investments would pay off.[71]

The directors also cited the shift toward high-value customers. Cunningham testified that the optimism about high-value subscribers "ended up not panning out over

---

[67] *Id.* at 1250:23–1252:12 (Goodman).

[68] *Id.* at 1880:19–1881:13 (Herman).

[69] *Id.* at 2041:23–2042:12 (White).

[70] JX-293 at 7.

[71] Trial Tr. at 1366:20–22 (Goodman).

17

the subsequent year [2018]."[72] Liaw and White testified that Mindbody's high-value subscribers had declined in 2018 for two quarters in a row.[73] Again, the contemporaneous documents paint a different picture, with White's slides at the same conference proclaiming "Our Customer Base is Healthier than Ever"[74] and "Subscriber Base Shifting To Higher Priced Tiers."[75]

Mindbody's results for Q3 2018 were mixed. The highlights were an increase of 19% in year-over-year average revenue per subscriber and the first organic increase in net new subscribers in two years.[76] The lowlights included a revenue miss of $2.4 million against Mindbody's internal plan and $0.2 million against the analyst consensus.[77]

The consensus view was that if Mindbody could weather a year or so of challenges, then the future was bright. Stollmeyer estimated in October 2018 that "[f]ull realization of the synergies" from the Booker and FitMetrix acquisitions "will take 1–2 years."[78] At trial, he confirmed that expectation.[79] By October 2018, Goodman "absolutely believed the investments would pay off" and saw no need for cash infusions.[80]

---

[72] *Id.* at 882:3–883:3 (Cunningham).

[73] *Id.* at 1461:20–1462:7 (Liaw); *id.* at 2090:1–8 (White).

[74] JX-293 at 104.

[75] *Id.* at 105.

[76] JX-414 at 3.

[77] *Id.* at 3.

[78] JX-476 at 2.

[79] Trial Tr. at 610:17–611:10 (Stollmeyer).

[80] *Id.* at 1366:20–1367:1 (Goodman).

18

At trial, Stollmeyer and Vista sought to show that because of the risks that the Company faced, the Board viewed a sale as the best option for stockholders, and there is support for that conclusion in the record.[81] Yet, crediting that the Board reached that conclusion does not require crediting that the Merger was the best transaction reasonably available, and that was because of how the sale process played out. The Board comprised many talented individuals, but only Goodman had any experience selling a public company. The Company's outside counsel described the Board as "super green" and recommended thorough training regarding what a process would entail.[82]

At the time the Board embarked on a sale process, the Board was not aware of the conflicts afoot. Although Defendants proved that the Board knew that Stollmeyer wanted to resign as CEO within two to three years,[83] the Board did not know that he wanted to sell the Company sooner or that IVP was in lockstep with Stollmeyer toward this goal. Stollmeyer did not disclose his need for liquidity to any Mindbody director at any time

---

[81] *See id.* at 1347:19–1348:5 (Goodman) (testifying that she "thought this was an excellent price that would derisk the future for our shareholders"); *id.* at 2188:21–2189:17 (Smith) (testifying that "the premium that the company was getting in a cash transaction was definitely worth accepting versus the uncertainty of potentially several years of uncertain execution").

[82] JX-577.

[83] Goodman testified that Stollmeyer approached her in August 2018 to suggest that the Board start looking for a successor because the next year would be his last year, that "he openly admitted that he was getting tired," and that she informed the other directors of Stollmeyer's intentions. Trial Tr. at 1265:5–1266:8 (Goodman). Herman and Cunningham testified that the Board discussed potential CEO replacements at their September 2018 dinner. *Id.* at 1890:15–1891:16 (Herman); *id.* at 884:21–885:8 (Cunningham).

during the sale process.  Neither Stollmeyer nor Liaw disclosed IVP's desire to exit.  And Stollmeyer concealed many of his interactions with Vista from the Board.

## B.    Events Before The Board Process

On August 7, 2018, Stollmeyer met with Jeff Chang, an investment banker with Qatalyst Partners.[84]  Stollmeyer and Chang had been meeting from time to time over the course of five years.[85]  Chang testified that before August 2018, Stollmeyer "had never been open-minded to having dialogue" with private equity.[86]  During the August 7 meeting, however, something was different, and Stollmeyer was "more open to having a dialogue."[87]

Stollmeyer had kept in contact with a couple of private equity shops.[88]  Before Mindbody's IPO, Vista and Thoma Bravo had each approached Mindbody about an acquisition.[89]  Stollmeyer thought they would be good places to start.  Chang had a good relationship with Vista.  He had sold about four or five companies to them and advised

---

[84] JX-231 at 1.

[85] Trial Tr. at 255:14–257:1 (Chang).

[86] *Id.* at 255:20–259:1 (Chang).

[87] *Id.* at 260:18–24 (Chang).

[88] *Id.* at 362:23–363:13 (Stollmeyer) (regarding communications throughout 2014–2017); *id.* at 365:11–367:16 (Stollmeyer) (regarding communications with Thoma Bravo and H&F in 2016 and 2018); JX-618 (reflecting communications with Thoma Bravo); JX-243 (reflecting communications with H&F); JX-1804 at 2 (reflecting Vista's reconnection with Stollmeyer in 2017); JX-176 (reflecting May 2018 meeting with CCO of GoDaddy); JX-1543 (reflecting February 2018 meeting with Qatalyst); JX-1509 (reflecting August 2018 meeting with Centerview); JX-196 (reflecting June 2018 meeting with TCV).

[89] JX-231 at 1.

20

Vista or its affiliates.[90] Monti Saroya, a Vista principal, had been involved in transactions

where Chang represented the seller.

### 1. Qatalyst Reconnects Stollmeyer And Vista.

During the August 7 lunch meeting, Chang offered to reconnect Stollmeyer to Vista.

Immediately after lunch, Chang did so by email.[91] Chang wrote to Saroya:

> I was with Rick [Stollmeyer] today, . . . . I know you all have
> met before but thought a direct thread might be helpful to get
> you, Brian [Sheth] and Rick together some time in the future.
> Nothing pressing, but thought it'd be helpful for you all to
> meet.[92]

Saroya responded about seven minutes later to set up a meeting.[93]

Shortly after, Chang forwarded the email chain to George Boutros, a senior partner

at Qatalyst.[94] In the forwarding email, Chang provided the following report:

> Known them [Mindbody] since pre-IPO and founder/CEO
> [Stollmeyer] has never wanted to sell. Vista and Thoma
> [Bravo] tried to acquire them pre-IPO.
>
> Met with him [Stollmeyer] today and he immediately talked
> about how he is tired of being public and wanted me to re-
> connect him w[ith] Vista and Thoma. Probably a 2019 deal is
> my guess.[95]

---

[90] Trial Tr. at 251:3–254:24 (Chang); *see also* JX-591 at 2.

[91] JX-230.

[92] *Id.* at 2.

[93] *Id.* at 1.

[94] JX-231.

[95] *Id.* at 1.

By 7 p.m. that same day, Saroya and Stollmeyer had scheduled a meeting for "late Aug/ early Sep."[96]

Chang waited a week to connect Stollmeyer with two other private equity firms, Thoma Bravo and Hellman & Friedman ("H&F").[97] Stollmeyer did not meet with those firms until mid-October and early November.[98]

### 2. Stollmeyer Takes Luxor's Temperature.

On August 9, 2019, two days after reconnecting with Vista, Stollmeyer met with Luxor, which had owned shares of Mindbody since 2016. By August 2018, Luxor had accumulated a 14% stake in the Company,[99] but Luxor does not fit the mold of an "activist" investor. Luxor does not seek to take control of companies. It is not in the habit of demanding to inspect books and records of its investments. And it had not petitioned for appraisal or sought to be lead plaintiff in a representative action before this lawsuit.[100]

Stollmeyer wanted to know where Luxor stood on a sale. If IVP followed through on its stated intention to exit, Luxor would be Mindbody's largest public investor. Even if IVP did not exit, Luxor would become Mindbody's largest investor as soon as the super-voting Class B shares converted to Class A in October 2021.

---

[96] JX-230 at 1.

[97] JX-238; JX-239; JX-250 at 2.

[98] JX-566; *see also* JX-317; Stollmeyer Dep. Tr. at 292:18–293:2.

[99] JX-266 at 3.

[100] Trial Tr. at 17:1–18 (Friedman).

22

Historically, Luxor had worked constructively with Mindbody management and the Board. And Luxor was extremely knowledgeable of Mindbody's business. Luxor conducted substantial research on its investment in Mindbody, including collecting and analyzing data on the number of users downloading the Mindbody app monthly, the transaction behavior of Mindbody customers, and the progress of Mindbody's dynamic pricing model.[101] Stollmeyer described Luxor as having "unparalleled knowledge of MB," "unfettered access to [CFO] Brett White and me for years," and as being "more [knowledgeable] about this company than any other public investor."[102]

Stollmeyer had met with Luxor as recently as June 2018. At that point, the discussion focused on having Luxor's Doug Friedman join the Board.[103] Stollmeyer was initially receptive to the idea, as he expected Liaw to be leaving his position on the Board, making room for an alternative institutional stockholder representative.[104] By the August 9 meeting, however, Stollmeyer's tune had changed, and he wanted to know whether Luxor would support a sale.[105] Friedman responded that Luxor would not support a near-term sale because Luxor expected much higher return over the long term.[106]

---

[101] Trial Tr. at 26:7–29:5 (Friedman).

[102] JX-1118 at 2; Stollmeyer Dep Tr. at 816:16–819:15.

[103] Trial Tr. at 429:10–431:24 (Stollmeyer).

[104] *Id.* at 429:10–431:24 (Stollmeyer).

[105] *Id.* at 32:20–34:7 (Friedman); *id.* at 33:1–34:7 (Friedman); *id.* at 429:10–431:24 (Stollmeyer).

[106] *Id.* at 33:1–34:7 (Friedman).

Concerned about resistance to a sale, after the August 9 meeting, Stollmeyer instructed one of Mindbody's long-time advisers, David Handler of Centerview Partners LLC ("Centerview"), to create a comprehensive dossier on Luxor, including any activist campaigns.[107]

### 3. Stollmeyer Meets With Vista.

On September 4, 2018, Stolleyer met with Saroya and another Vista representative, senior vice president Nicolas Stahl.[108] Saroya and Stahl were the lead Vista representatives for the Mindbody deal.

Saroya and Stahl testified at trial that they did not recall the specifics of the September 4 meeting. Stahl, however, prepared a contemporaneous summary of the meeting consistent with Vista's practices.[109] It stated:

> We met with Rick [Stollmeyer]. Rick mentioned he would like to find a good home for his company. He is getting tired and expects to stay in his seat 2-3 more years. He has 2 folks (one from Booker acq[uisition]) that he thinks could succeed him.[110]

During the meeting, Saroya invited Stollmeyer to join them for the CEO dinner at Vista's CXO Summit.[111] Saroya did not remember any of those details. He recalled that they

---

[107] JX-265; JX-266; Trial Tr. at 528:5–12 (Stollmeyer).

[108] JX-264; JX-277.

[109] Trial Tr. at 781:9–782:8 (Stahl).

[110] JX-277.

[111] JX-264.

24

"talked about how excited he is for the market, how well Mindbody has done historically, and how he thinks Mindbody has a bright future."[112]

Stollmeyer did not have Board authorization to disclose that he was planning to step down in two or three years or that he had two people in mind to succeed him.[113] After the September 4 meeting, Stollmeyer did not tell the Board that he had disclosed this information to Vista.[114] Stollmeyer admitted that he did not provide this information to any other potential acquirers in August, September, or October 2018.[115]

The fact that Stollmeyer told Vista that he was looking for a "good home" for Mindbody was a bad fact for Defendants. It indicated that Stollmeyer had tipped off Vista that Mindbody was considering a near-term sale and that Stollmeyer would be leading the process. So, at trial, Stollmeyer denied it. He asserted that he never would have used the words "good home," claiming "the idea that I was looking for something like that and I would say that to them, it just doesn't feel like something I would say. I don't recall saying it."[116] He also said that he would never refer to Mindbody as "my" company.[117] That testimony was not credible. As to finding a "good home" for Mindbody, Stahl used this "home" terminology describing Stollmeyer's position in not one, but two contemporaneous

---

[112] Trial Tr. at 1033:21–1034:4 (Saroya).

[113] *Id.* at 524:15–525:7 (Stollmeyer).

[114] Stollmeyer Dep Tr. at 298:23–300:8; Lytikainen Dep Tr. at 85:6–89:17; Liaw Dep Tr. at 134:10–135:11.

[115] Trial Tr. at 524:15–525:7 (Stollmeyer).

[116] *Id.* at 374:18–375:13 (Stollmeyer).

[117] *Id.*

25

documents.[118]   As to calling Mindbody "my company," Stollmeyer used this exact terminology during his post-Merger podcast interview with Cremades.[119]   More likely than not, Stahl's notes of the meeting provide an accurate account of what occurred.

### 4.    Stollmeyer Gives The Board A Partial Account Of His Meeting With Vista.

At an informal Board dinner in Santa Monica on September 5, 2018, Stollmeyer advised the Board that he had met with Vista, but he did not give a full report on the meeting.[120]   He did not report on his discussion with Qatalyst about a potential sale.[121]   The Board instructed Stollmeyer to keep them in the loop, not get "too far advanced" in his conversations, and to "get smart on the topic" of selling the Company.[122]   That was also the day that Centerview provided Stollmeyer with the dossier on Luxor.[123]

The Board meeting that followed on September 6 was seemingly uneventful.  The minutes reflect that members of management presented on Mindbody's growth, retention, and integration performance.[124]   White covered Q2 highlights, areas of growth, and

---

[118] *See* JX-277; JX-344.

[119] JX-1441 at 10.

[120] Trial Tr. at 978:6–981:2 (Cunningham); *id.* at 1363:4–24 (Goodman).

[121] *Id.* at 972:10–18 (Cunningham); *id.* at 1360:8–10, 1362:1–4, 1362:1–23 (Goodman).

[122] *Id.* at 1268:8–1269:17, 1364:1–5 (Goodman).

[123] JX-265.

[124] JX-270.

management's second-half outlook.[125]  The minutes do not mention Stollmeyer's meeting with Saroya and Stahl, nor the invitation to attend the CXO Summit.

A few days later, on September 9, Handler copied Stollmeyer on an email to Mindbody's Chief Legal Officer, Kimberly Lytikainen, asking for a meeting to "discuss the various elements of dealing with the Luxor situation."[126]  On September 10, Stollmeyer asked Centerview to "add an analysis of my voting power if I exercised all of my vested options as of the end of the year."[127]  Centerview provided this information on September 17.[128]

### 5.     Stollmeyer Attends Vista's CXO Summit And Is Blown Away.

Vista's CXO Summit is an annual gathering of senior executives from Vista portfolio companies and select industry guests. Vista uses the conference to prospect for acquisition targets.[129]  Saroya testified that the CXO Summit gives CEOs from potential targets "a flavor of what it feels like to work for Vista" and helps "take away the myth that [Vista] might be a slash-and-burn shop."[130]

---

[125] *Id.* at 2.

[126] JX-1617 at 2.

[127] *Id.* at 1.

[128] *Id.*

[129] JX-264; Stahl Dep. Tr. at 34:9–35:19; *see also* Stollmeyer Dep Tr. at 286:6–287:18.

[130] Trial Tr. at 1123:12–20 (Saroya).

Stollmeyer accepted Saroya's invitation to attend the CXO Summit on October 9.[131] At the summit, he met with executives from Vista portfolio companies.[132] After the first day, Stollmeyer texted Saroya to ask for a one-on-one meeting with Vista's founder Robert Smith, Vista's President Brian Sheth, or Vista portfolio company CEO Reggie Aggarwal.[133] Stollmeyer asked Vista to put him in touch with Aggarwal because he wanted "to know what it's like to sell to Vista as a founder."[134] Stollmeyer pitched Mindbody to Robert Smith in a brief meeting on October 9.[135]

Stollmeyer watched presentations from both Robert Smith and Sheth at the summit.[136] Smith's presentation included estimated wealth creation for CXOs who took their companies private with Vista and noted that Vista portfolio company executives had earned $488.6 million since 2017.[137]

Stollmeyer texted Saroya that the "[p]resentations are very impressive."[138] He texted Mindbody's President Michael Mansbach that the presentations are "mind blowing/inspiring."[139] Stollmeyer told Mansbach later that day that Vista "really love[s]

---

[131] *Id.* at 980:13–19 (Cunningham); *id.* at 1274:6–1274:11, 1364:9–12 (Goodman); *id.* at 2170:17–2171:1 (Smith).

[132] *Id.* at 389:20–23 (Stollmeyer).

[133] JX-327.

[134] JX-344; *see also* Stollmeyer Dep. Tr. at 384:9–385:21.

[135] Trial Tr. at 389:20–390:23 (Stollmeyer).

[136] *Id.*

[137] JX-343 at 124–25.

[138] JX-327.

[139] JX-328.

me, I love them."[140]  Stollmeyer also told Mansbach that the CXO Summit helped him "center on what is nagging from my subconscious."[141]  Stollmeyer sent Mansbach a series of screenshots, which Stollmeyer described as "money shots," from a presentation that Sheth gave.[142]  Two of the screenshots focused on Vista's 2016 acquisition of Marketo for $1.8 billion and subsequent sale of Marketo in 2018 for $4.75 billion.[143]  At trial, Stollmeyer admitted that Marketo made an interesting parallel to Mindbody and that Marketo was "purchased by Vista and then Vista sold them in a fairly short order . . . with a really strong return."[144]  Friedman testified that Stollmeyer later touted to Luxor "that Vista had bought [Marketo] and then sold it 18 months later for 3x the price."[145]  Stollmeyer would later tell his financial advisor that, after a sale to Vista, "he could make as much money over the next three years as he did the first go around."[146]

Stahl set up a meeting between Stollmeyer and Aggarwhal.  In a text to Aggarwal on October 9, Stahl explained that Stollmeyer wanted "to know what it's like to sell to Vista as a founder."[147]  Stahl's text also used the concept of a "home" for Vista, adding

---

[140] Stollmeyer Dep. Tr. at 326:8–328:12.

[141] JX-332 at 1, 3.

[142] JX-333.

[143] JX-334; JX-335; *see also* Stollmeyer Dep. Tr. at 364:5–366:14.

[144] Trial Tr. at 532:13–533:3 (Stollmeyer).

[145] *Id.* at 72:18–74:6 (Friedman).

[146] JX-1262.

[147] JX-344.

that Stollmeyer "is hyper focused on maintaining culture and ensuring his business finds the right home that will accelerate growth, not cause it to falter."[148]

The Board was aware that Stollmeyer was attending the CXO Summit, but Stollmeyer did not have Board authorization to tell Vista that he was focused on finding a home for Mindbody.[149] Stollmeyer never told the Board that he had done so.[150]

The CXO Summit changed the way Stollmeyer viewed a sale to a private equity firm, or at least a sale to Vista. He explained: "what I saw there really shifted my paradigm a bit on how private equity operates. Classically, you think of private equity firms as purchasing companies and kind of stripping out the investments to yield maximum cash flow."[151] Centerview's Handler agreed that the CXO Summit changed Stollmeyer's perception of private equity and that Stollmeyer saw Vista as "his solution."[152] Consistent with his text to Mansbach, Stollmeyer admitted at trial that he left the CXO Summit with the impression that Vista really loved him and he loved them.[153] Vista felt the same, touting internally that Stollmeyer "loved" them and that they "built a strong relationship with [Stollmeyer]."[154]

---

[148] JX-344.

[149] Stollmeyer Dep Tr. at 313:12–18.

[150] Lytikainen Dep Tr. at 86:14–20; Liaw Dep. Tr. at 134:10–135:11.

[151] Trial Tr. at 393:21–394:16 (Stollmeyer).

[152] *Id.* at 183:5–11 (Handler) ("I would describe it as he had a sea change in terms of his impression of the PE world, and he had gone from really one end of the spectrum to another. You know, hated and despised to beloved. You know, this was his solution.").

[153] *Id.* at 535:22–536:1 (Stollmeyer).

[154] JX-350; JX-372 at 1.

After the CXO Summit, Vista began drafting a memorandum about Mindbody for its Investment Committee, the group tasked with deciding whether to approve or reject an acquisition.[155] The draft recounted Stollmeyer's attendance at the CXO Summit and noted that Stollmeyer "mentioned to Nicolas how impressed he had been with Robert [Smith] and Vista's vision, reiterating his intention to explore a take-private for Mindbody."[156] Stollmeyer conceded at trial that he did not have authorization to tell Vista in mid-October 2018 that he intended to explore a take-private for Mindbody.[157]

### 6.    Stollmeyer Works With Qatalyst To Kick Off A Sale Process.

After the CXO Summit, Stollmeyer became laser focused on a sale to Vista. On October 11, 2018, Chang and Stollmeyer discussed beginning "preparatory work prior to kicking off a process for Mindbody[.]"[158] Stollmeyer asked Chang to provide references for Vista.[159] Chang provided two, one of whom had sold his company to Vista in a deal where he was represented by Qatalyst.[160]

In that same email, Chang cautioned Stollmeyer that whenever Vista asked Mindbody for non-public information, Stollmeyer should confer with Chang "because it is at that juncture they will use their ability to move quickly to their advantage[]" and "it is

---

[155] JX-1461.

[156] *Id.* at 1.

[157] Trial Tr. at 538:18–22 (Stollmeyer).

[158] JX-129 at 1; JX-410 at 1.

[159] JX-356.

[160] JX-410.

31

very important to get the right 'process' and messaging from the start to optimize for value."[161]   Stollmeyer later commented that "[t]his advice proved to be prescient and important."[162]

### 7.   Vista Expresses An Interest In Acquiring Mindbody.

On October 15, 2018, Saroya called Stollmeyer, and the two spoke for twenty-five minutes.[163]   During the call, Saroya delivered an oral expression of interest to acquire Mindbody.[164]   Saroya told Stollmeyer that Vista would pay a substantial premium to Mindbody's recent trading price, which closed at $33.27 on October 15.[165]   Stollmeyer understood that Vista saw Mindbody's recent stock correction as a buying opportunity.[166]   At trial, Stollmeyer testified that he told Saroya that Mindbody was "not for sale" but that he would relay Vista's interest to the Board.[167]   Those statements do not take twenty-five minutes to say.

### 8.   Vista Initiates Its Internal Process.

Vista is a pro at acquiring companies.  As Chang had warned Stollmeyer, Vista's advantage is speed.  Vista likes to engage "in significant background work" and is "[p]ro-active in making friendly unsolicited approaches and prefer[s] to kick-off processes vs.

---

[161] JX-410 at 2.

[162] Trial Tr. at 545:17–18 (Stollmeyer).

[163] PTO ¶ 97.

[164] *Id.* ¶ 98.

[165] Trial Tr. at 549:13–550:11 (Stollmeyer).

[166] *Id.* at 549:13–550:11 (Stollmeyer).

[167] *Id.* at 400:5–12 (Stollmeyer).

reacting to outreach."[168] Vista then capitalizes on its ability to "move very quickly through both business and confirmatory diligence" and leverages its early analysis "to truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line[.]"[169] The record at trial involved precedent transactions in which Vista used this strategy, and Vista representatives testified about the strategy and its competitive advantages.[170] In internal communications, Vista representatives call it "Sprinting,"[171] capitalizing the word as if it were defined term.

Vista deployed its go-early-and-fast strategy after the CXO Summit. Stahl texted Saroya on October 11, "MB down another 6% today. Thoughts on going to IC next week to get a hunting license?"[172] Saroya then texted Stahl on October 14, suggesting, "[l]et's get the list of stuff we need from MB ready. I'm going to try and catch [Stollmeyer] tomorrow and tell him I want to send him the list ASAP and get going."[173] Stahl texted a fellow Vista deal team member on October 14:

> I've been back and forth with Monti today and we are likely going to Sprint hard on Mindbody (they have now engaged a banker) and may be trying to sign a deal in the next 2-3 weeks. Would it be possible to upgrade / add to our team to enable us to Sprint?[174]

---

[168] JX-593 at 46.

[169] *Id.*

[170] Trial Tr. at 1151:4–7 (Saroya).

[171] *See, e.g.*, JX-378.

[172] JX-1457 at 1.

[173] *Id.*

[174] JX-378.

When presented with these texts at trial, Saroya agreed that Vista was "gearing up and trying to push hard to get to a signing very fast."[175]

Initially, Vista set a goal of signing an agreement before the Company's next earning's call, which was fewer than three weeks away. On October 14, 2018, Stahl texted Vista deal team member Derek Klomhaus that "Monti wants to announce before their earnings. What day is that in November? Have Mike add to all of our calendars (incl[uding] Monti)."[176] On October 15, Stahl texted Saroya suggesting that "even if the earnings call is 10/25, we could still Sprint to sign beforehand."[177] Vista's goal was to "try to get ahead of" any competitors in the Company's sale process.[178]

Vista also gamed out ways to block other bidders. As early as October 15, Stahl noted that Vista's outside counsel was already "thinking through how to reduce interloper risk / goshop risk."[179] Chang wanted to reach out to other companies before Vista could act.[180]

Vista started requesting a market study—a third-party analysis of a particular market for an acquisition. On October 19, Stahl texted Saroya to ask permission to conduct a

---

[175] Trial Tr. at 1048:18–23 (Saroya).

[176] JX-1781.

[177] JX-1490 at 29.

[178] JX-409.

[179] JX-1490 at 29. At trial, Saroya claimed unpersuasively not to know what his text meant. Trial Tr. at 1164:2–10 (Saroya).

[180] Trial Tr. at 303:20–304:7 (Chang).

market study on Mindbody.[181]  Saroya texted back "yes" in less than thirty seconds,[182] and Vista retained Bain & Co. to conduct the study.[183]  A typical market study takes between two to five weeks to complete, so it was an advantage for Vista to request it before the Company launched its sale process.  The study was expensive—the final price tag for the four-week analysis was $960,000[184]—so Vista would not have contracted for it without some confidence that Mindbody would be running a sale process.[185]

### 9.    Stollmeyer Tells His Team About Vista's Interest.

While Vista was revving up its internal process, Stollmeyer began dribbling out news about the expression of interest.  Stollmeyer told his management team first.  On October 17, 2018, Stollmeyer sent an email to Mansbach, White, and Lytikainen with the heading "Highly Confidential – For Your Eyes and Ears Only.  Do not forward or discuss outside this group without my permission[.]"[186]  Stollmeyer relayed Vista's expression of interest and that Vista "would pay a substantial premium to recent trading range and see the stock correction an opportunity."[187]

Stollmeyer tried to give his team some comfort, stating that he believed that a private equity sale might be Mindbody's best option to achieve its long-term vision, but that a sale

---

[181] JX-423.

[182] JX-424.

[183] JX-681.

[184] JX-1644.

[185] Trial Tr. at 705:11–15 (Klomhaus).

[186] JX-410 at 1.

[187] *Id.*

would not be an "automatic 'exit'" for management.[188] Overall, Stollmeyer seemed excited about a deal with Vista and described the possibility as "lean[ing] into an acquirer who sees our current capabilities, gets our huge potential, and has the resources to accelerate our results over the 3 year planning window, and expedite the full realization of what [*sic*] our Vision and Purpose."[189]

Stollmeyer told the email recipients that he "plan[ned] to socialize this possibility to the Board [of] Directors individually over the next week" and further said "[p]lease do not hint or otherwise discuss with them or anyone else until I have a chance to do so and give you the green light."[190] Stollmeyer acknowledged that the "conversation" with Vista was "progressing rapidly."[191]

Next, Stollmeyer told Liaw of Vista's expression of interest during an hour-long conversation on October 18.[192] Liaw texted Stollmeyer later that same day, asking him to "[p]lease keep me posted on the other conversations."[193] Stollmeyer replied that he appreciated hearing Liaw's perspective and "our alignment on the key elements."[194]

On October 19, before he had spoken with any Board member other than Liaw, Stollmeyer spoke for thirty-one minutes with Andre Durand, the founder and CEO of a

---

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] *Id.*

[192] Trial Tr. at 574:21–575:12 (Stollmeyer).

[193] JX-1618 at 1.

[194] *Id.* at 2.

company that sold to Vista. Durand was one of the two references that Chang had provided for Qatalyst.

Stollmeyer testified that Durand was incredibly positive about his experience with Vista on this call.[195] Durand reported to Saroya that the conversation turned out to be a reference call for Vista."[196] Saroya replied, "Yup I was aware[.]"[197] Stollmeyer did not tell the Board about his conversation with Durand.[198]

### 10. Stollmeyer Informs The Other Directors Of Vista's Interest.

Stollmeyer waited until October 23—eight days after Vista's expression of interest—to begin contacting the remaining Board members.[199] When he spoke with the directors, Stollmeyer omitted key elements of his discussions with Vista[200] and key pieces of information that he had shared with his management team.

Four of Mindbody's six outside directors—Cunningham, Goodman, Herman and Smith—testified at trial. All four admitted that they were unaware of key facts as of October 23. They agreed that none of them knew about IVP's desire for a near-term exit.[201] To varying degrees, they agreed that they did not know that Vista viewed the downturn in

---

[195] Trial Tr. at 559:1–560:2 (Stollmeyer).

[196] JX-421 at 1.

[197] JX-422 at 1.

[198] Trial Tr. at 560:3–9 (Stollmeyer).

[199] JX-1442; Trial Tr. at 574:9–575:5 (Stollmeyer).

[200] Herman Dep Tr. at 88:5–89:8; Lytikainen Dep Tr. at 101:3–102:18.

[201] Trial Tr. at 920:3–5, 968:13–16 (Cunningham); *id.* at 1383:24–1384:6 (Goodman); *id.* at 1492:15–1493:1 (Liaw).

Mindbody's stock price as a buying opportunity or that Vista planned to make an offer based on a premium over the Company's trading price, which meant that a further downturn in the Company's stock price would result in a lower bid.[202] The directors' testimony also indicates that they did not know that Stollmeyer had already interacted with Vista on multiple occasions, had spoken with a portfolio company CEO about his experience selling to Vista, and had told Vista that he planned to step down in two to three years.

### C. The Formal Sale Process Begins.

During a regularly scheduled Board meeting on October 26, 2018, the Board discussed Vista's expression of interest and whether to form a transaction committee to explore a potential acquisition (the "Transaction Committee").[203] This portion of the meeting occurred in executive session. Stollmeyer remained present, but other members of management were excused.[204]

At some point on or before October 26, Stollmeyer asked Liaw to serve as chair of the Transaction Committee, and Liaw agreed.[205] During the meeting, Liaw started acting

---

[202] *Id.* at 890:21–891:3 (Cunningham) (testifying that he did not know about Vista's plan to price its offer based on Mindbody's trading price); Goodman Dep. Tr. at 114:14–19 (testifying that she was not aware that Vista viewed the downturn in Mindbody's stock as a buying opportunity); Smith Dep. Tr. at 69:8–72:18 (testifying that he did not know that Vista intended to price its offer based on Mindbody's trading price). Herman claimed not to recall anything about her conversation with Stollmeyer. Herman Dep. Tr. at 88:5–14.

[203] PTO ¶ 111; JX-1426 at 180; Trial Tr. at 895:10–896:7 (Cunningham).

[204] JX-1426 at 181.

[205] Trial Tr. at 576:6–10 (Stollmeyer): *id.* at 1429:24–1430:4 (Liaw).

like the chair, and everyone else went along. The other Board members did not know when or how Liaw became the presumptive chair of the committee. Goodman testified that Liaw's role as chair was just "assumed" at the October 26 board meeting.[206] The Board did not know at that time that IVP was looking to exit and therefore did not discuss whether IVP's interest in selling would affect Liaw's ability to consider strategic alternatives independently.[207]

During the meeting, Liaw asked for volunteers to join the Transaction Committee, warning directors that a sales process can be time-consuming and that they should not "volunteer lightly."[208] Goodman texted Liaw to volunteer.[209] Later that day, Liaw asked Stollmeyer to "take the lead on conversations to fill out the rest of the committee," but Liaw seemed to continue to play a vetting role.[210] Cunningham joined the committee after talking through the commitment with Liaw.[211]

---

[206] *Id.* at 1382:19–1383:2 (Goodman); *see also id.* at 2196:6–12 (Smith) (testifying that he did not know who proposed the membership of the committee or how Liaw was chosen as its chair).

[207] *Id.* at 1383:24–1384:2 (Goodman); *id.* at 1895:15–1896:2 (Herman).

[208] *Id.* at 895:10–896:7 (Cunningham).

[209] PTO ¶ 112.

[210] JX-454.

[211] Trial Tr. at 895:16–896:7 (Cunningham).

The Board created the Transaction Committee by unanimous written consent on October 30, 2018.[212] It comprised Liaw, Goodman, and Cunningham, with Liaw as chair.[213]

The Transaction Committee's initial mandate was to interview financial advisors and make a recommendation to the Board on whether to engage one or more financial advisors to assist in reviewing strategic alternatives.[214] That was it.

On October 31, the Transaction Committee met with Mindbody's Chief Legal Officer and outside counsel who advised the Board on a regular basis.[215] Among other things, the committee members reviewed the initial expectations, their mandate, and set the date of November 14 to interview potential financial advisors.[216] During a closed session of the meeting that excluded Stollmeyer and other management members, the Committee discussed

> the importance of establishing a process . . . that was independent and free of any influence from members of management or other directors who, depending on the circumstances, could have (or could be viewed to have) a potential conflict with respect to any specific financial advisor or potential strategic partner.[217]

---

[212] JX-1426 at 182–84.

[213] *Id.*

[214] PTO ¶ 114.

[215] JX-475.

[216] JX-487 at 1; JX-475 at 1.

[217] JX-475.

40

Toward that end, the committee requested sample "'neutrality' guidelines to serve as a framework for ensuring that management understood its role in any potential process."[218]

With the assistance of outside counsel, the Transaction Committee prepared "guidelines for communications, potential conflicts and disclosure matters" (the "Guidelines").[219] The Guidelines required management to obtain "authorization for outbound communications to potential strategic parties or financial advisors, timely reporting of indications of interest or strategic inquiries to the board or Strategic Transaction Committee and flagging any potential conflicts."[220]

The Transaction Committee adopted the Guidelines during the October 31 meeting, and Lytikainen emailed the Guidelines to the Board on November 2.[221] Stollmeyer received and reviewed the Guidelines.[222]

### D. The Company Lowers Guidance.

During late October and early November, the Company was preparing to release Q4 guidance. Investors watched the Company's guidance closely, and the stock price had a history of reacting to it.

---

[218] *Id.* at 2.

[219] JX-487 at 1; JX-475 at 1.

[220] JX-487 at 3–4.

[221] *Id.*; Trial Tr. at 898:20–899:9 (Cunningham) ("The point of the guidelines was to make sure that they weren't disclosing price, talking about structure, talking about their employment, very strategic, needy things[.]"); *id.* at 1587:3–10 (Lytikainen) (similar); *id.* at 2201:22–2202:8 (Smith) (similar).

[222] Stollmeyer Dep. Tr. at 651:10–18.

Mindbody had been struggling to hit its publicly disclosed targets throughout 2018. In the first half of 2018, Mindbody revised its 2018 full-year guidance to well below Street expectations.[223] And at the end of Q2 2018, Mindbody reduced the midpoint of its full-year revenue guidance by approximately $1 million.[224] During the second half of 2018, Mindbody continued to miss targets.[225] Its Q3 revenue ($63.8 million) missed the midpoint of Mindbody's already-reduced Q3 revenue guidance ($64 million).[226] By September 2018, Mindbody's internal Q4 revenue forecast stood at $69.40 million, down from May's $72 million forecast.[227]

By October 2018, Mindbody's Q4 revenue forecast had slipped to approximately $68 million.[228] On October 26, White provided the Audit Committee a "first pass, preliminary view of Q4'18 guidance" of $65–$67 million against a forecast of $67.8 million.[229] On November 2, Mindbody's head of financial planning and analysis ("FP&A"), Craig Heinle, advised that his best estimate had risen to $67.8–$68.2 million.[230]

Stollmeyer felt that because of the Company's prior difficulties meeting estimates, the Board and the FP&A team "had now swung the pendulum to being overly

---

[223] JX-179 at 7; Trial Tr. at 1432:6–1433:16 (Liaw); *id.* at 2037:2–22 (White).

[224] JX-210 at 8; *see also* Trial Tr. at 1433:20–1434:15 (Liaw).

[225] Trial Tr. at 411:5–15 (Stollmeyer).

[226] JX-414 at 29.

[227] JX-1860 at 9; JX-1861 at 12.

[228] JX-1433; JX-503 at 2.

[229] JX-456.

[230] JX-496; Heinle Dep. Tr. at 123:12–124:12.

conservative."[231]  Stollmeyer wanted to "guide to the closest thing we could to our reality."[232]  On November 5, Stollmeyer emailed Gold and members of the Mindbody management team that he had "never played a game of lowered expectations" and that "[i]f I change my tune now, that would be inauthentic and disheartening.  It would also sound weird to those who know me."[233]  On the morning of November 5, after digging into the forecast, Stollmeyer suggested guiding to $67–69 million.[234] That evening, however, Stollmeyer and White presented a revised forecast of $68.1 million and a revised proposed guidance range of $66–68 million, for which "the mid point would give us $1.1M in cushion."[235]

The revised guidance range of $66–68 million was conservative.  The $1.1 million cushion between the forecast and the midpoint of the guidance was more than the previous quarter,[236] even though management was unusually confident because the October flash report was "basically spot-on."[237]  There was only $305,000 of risk in the forecast, meaning that management did not foresee a scenario in which revenue would fall below $67.5

---

[231] Trial Tr. at 414:23–415:12 (Stollmeyer).

[232] Stollmeyer Dep. Tr. at 542:7–543:10.

[233] JX-510.

[234] JX-507; Trial Tr. at 415:13–24, 584:5–10 (Stollmeyer); *id.* at 2044:22–2045:1 (White).

[235] JX-531; JX-508 at 2.

[236] JX-206 at 28.

[237] Heinle Dep. Tr. at 95:9–14, 120:24–121:7.

million.[238]  Adjusted for high, medium, and low probability risks and opportunities, the forecast was greater than $68 million across the board.[239]

The Audit Committee convened by phone the evening of November 5.  Audit Committee members Liaw and Herman were present, along with Stollmeyer and White.[240]  Committee chair Smith had signed off on guiding $66–68 million before the meeting.[241]  Liaw favored lower guidance because "the only way to rebuild [credibility] or start to rebuild that is to show that [Mindbody] can hit, and ideally beat, future guidance."[242]  Herman agreed that guidance should position Mindbody to "beat and raise."[243]  They recommended guidance of $65–67 million.[244]

Stollmeyer and Liaw spoke immediately after the Audit Committee meeting for sixteen minutes.[245]

Three minutes after hanging up with Liaw, Stollmeyer texted White that he was "adding a new second paragraph in [his] script noting our challenges."[246]  Later that night,

---

[238] JX-508 at 1.

[239] *Id.*

[240] JX-531.

[241] JX-506; JX-531; Smith Dep. Tr. at 193:11–194:17.

[242] Trial Tr. at 1440:21–1441:13 (Liaw).

[243] *Id.* at 1980:23–1981:16 (Herman); *see also id.* at 1314:20–1315:8 (Goodman) (describing "beat and raise" as a "perfect kind of managing-the-street scenario"); *id.* at 2172:21–2173:15 (Smith).

[244] *Id.* at 1439:13–23 (Liaw); *id.* at 1900:23–1901:14 (Herman); *id.* at 2048:6–8 (White).

[245] JX-1442; Trial Tr. at 1528:3–1530:11 (Liaw).

[246] JX-504; *see also* Trial Tr. at 598:16–599:4 (Stollmeyer) (acknowledging that he made the script more negative after speaking with Liaw).

Stollmeyer circulated the revised script to his management team.[247] He deleted the portion of his script that noted Mindbody's substantial progress integrating Booker.[248] He pulled other "good stuff" from his script, deciding to "save [it] for future use."[249]

Stollmeyer led the November 6 earnings call during which Mindbody announced its Q3 revenue miss and issued Q4 guidance of $65–67 million.[250] He threw "Booker under the bus"[251] and referred to management's failed execution, noting that "we've been humbled by the last couple of quarters in dealing with the magnitude of integrating these businesses and ramping up growth at the same time."[252] Centerview employees observed in real time that Stollmeyer "sounded too apologetic [and] strange."[253] Friedman recalled Stollmeyer sounding "depressed" and listened to the call "in shock."[254]

After the earnings call, Mindbody stock fell 20%—from a November 6 close of $32.63 per share to a November 7 close of $26.18 per share.[255] The stock fell so far that Stollmeyer suggested to Liaw that Mindbody buy back shares.[256]

---

[247] JX-523.

[248] *Compare* JX-1434 *with* JX-523 at 3.

[249] JX-523 at 1.

[250] *Id.* at 3, 9.

[251] JX-397

[252] JX-527 at 10.

[253] JX-516.

[254] Trial Tr. at 41:24–42:6 (Friedman).

[255] JX-130 at 3.

[256] JX-1626.

45

Plaintiffs argue that Stollmeyer lowered guidance to depress Mindbody's stock price and make a deal seem more attractive. Certainly, Stollmeyer knew the guidance could affect the stock price. He told White and Mansbach a few days earlier that "a few hundred thousand of Q4 revenue makes a huge difference [on] Tuesday,"[257] and he testified that guiding $1 million higher would have affected Mindbody's stock price.[258] When asked at trial whether he was considering how guidance could impact the sales process, Stollmeyer acknowledged that, "a low guide, I certainly knew, was going to be a really unfortunate message to send to potential acquirers as we were talking to them and trying to rev up their excitement about our company."[259]

Liaw also knew that lowered guidance would make a sale more attractive. He and a colleague discussed that "the PE guys will drag it out if they think we will miss numbers."[260] Liaw later suggested to Goodman that lowering Q4 guidance would facilitate a sale, explaining that "if we are missing [guidance] they will slow roll us. Hence good to guide down as far as we did."[261] During his deposition, Liaw claimed that his recommendation to lower Q4 guidance was not in any way based on the prospective sale process.[262] He withdrew this statement at trial and admitted that the sale process was not

[257] JX-495 at 1.

[258] Trial Tr. at 579:2–13, 597:23–598:13 (Stollmeyer).

[259] *Id.* at 589:6–21 (Stollmeyer).

[260] JX-101 at 6.

[261] *Id.* at 14.

[262] Liaw Dep. Tr. at 398:18–399:13.

"completely absent from my mind."[263] He testified, however, that his "primary focus" when the Company lowered guidance "was figuring out how the company could start to rebuild credibility."[264]

In the end, the facts surrounding the Q4 guidance are murky. They reflect both a desire to establish a figure that the Company could hit and a recognition of the effect that low guidance would have for the attractiveness of a sale.[265]

### E.      Qatalyst Tips Vista About Stollmeyer's Target Price.

The drop in Mindbody's stock price after the November 6 earnings call caught Vista's attention.[266] Vista equated a lower stock price with a lower deal price,[267] leading to a greater profit in a future exit. Vista had recognized huge gains on software companies by

---

[263] Trial Tr. at 1483:5–1484:13, 1442:16–24 (Liaw).

[264] *Id.* at 1442:16–24 (Liaw).

[265] In a side debate, Defendants argued that the Audit Committee gave Stollmeyer "direction" and a "directive" on where to guide. *See* Dkt. 447 ("Defs.' Pre-Trial Br.") at 11, 13). But the Audit Committee members uniformly testified that the decision was up to management. Trial Tr. at 1952:16–1953:13 (Herman); *id.* at 2217:14–20 (Smith); *id.* at 1528:13–17 (Liaw). Herman went so far as to describe Defendants' word choice ("directive") as "unfortunate." *Id.* at 1954:8–21 (Herman). Defendants' counterfactual narrative on this point was unnecessary. In the end, Stollmeyer understood that it was his decision where to guide. *See* JX-499 at 3–4. He took Liaw's advice, but Plaintiffs failed to prove that Liaw's advice or Stollmeyer's decision on this issue emanated from a malicious intent to cater to an acquirer.

[266] JX-533 ("MB down 16% after earnings. Should we sprint?"); JX-557 ("You see mb earnings? Tanked"); JX-558 ("Absolutely demolished").

[267] Trial Tr. at 698:21–24, 701:24–702:5 (Klomhaus); *id.* at 1564:11–1566:7 (Sheth).

47

purchasing them when they experienced stock price "dislocation," then selling on the "rebound."[268]

On the evening of November 6, Stahl texted Saroya about Mindbody's stock drop: "MB down 16% after earnings."[269] Stahl asked, "Should we sprint?"[270] He also asked if Saroya had heard anything from Chang.[271] Saroya called Chang and spoke for five minutes.[272]

After the call, Saroya texted Stahl that "Jeff [Chang is] all over it" and that *"[h]e wants 40 min."*[273] Saroya then inquired about the implications of a $40 per share price for Vista's financial model, which Stahl had just reported was "in good shape," and Stahl responded that Vista "can lean in to get there," and that it would be easier to do so if Vista assumed a "7x+ exit multiple" rather than the "6x forward" they were currently running.[274] In other words, Stahl explained to Saroya how to make it work under the model to pay $40 per share for Mindbody.

The statement that "he wants 40 min" received a great deal of attention at trial. The clear implication of this text is that the pronoun ("he") referred to Stollmeyer, and that

---

[268] JX-1465 at 30.

[269] JX-533.

[270] *Id.*

[271] *Id.*

[272] JX-1452.

[273] JX-533 (emphasis added).

[274] *Id.* On October 11, Saroya had texted Stahl that he "would pay 6-7x forward" for Mindbody. JX-365 at 12.

48

Chang tipped Vista that Stollmeyer wanted a deal price of at least $40 per share. Other contemporaneous evidence shows that Stollmeyer wanted a deal price of at least $40 per share. Stollmeyer had implied it in mid-October when he described the expression of interest to his management team and wrote that Vista was willing to pay a "substantial premium" over Mindbody's stock price after it closed at $33.27 per share.[275] Chang said it in mid-November, writing internally that "Rick's bogey is $2bn,"[276] which equates to $40 per share.[277] Liaw said it in mid-December, telling Goodman and Cunningham that he was "modestly concerned that Rick still seems *focused on a 4-handle* by year end."[278] That is deal talk for at least $40 per share.[279]

Chang's pricing tip to Vista was a bad fact for Defendants. Unable to deny that the text was sent, Defendants attempted to explain it away, suggesting that the "40 min" text was sent accidentally and that Chang had meant to communicate to someone else at Vista (not Stahl) about a different transaction (Apptio). There is no support for that in the record. Both Saroya and Chang had zero recollection of what they discussed on the phone that day.[280] Unfortunately, there is little other contemporaneous evidence on this issue, because before this litigation arose, Saroya lost his phone and was unable to recover any text

---

[275] JX-410 at 1; JX-130 at 3.

[276] JX-589.

[277] Mindbody had 48,016,533 shares outstanding at that time, JX-1138 at 16, which means that a $2 billion deal price would translate into $41.65/share.

[278] JX-750 (emphasis added).

[279] Trial Tr. at 915:21–916:3 (Cunningham).

[280] *Id.* at 1195:20–1196:7 (Saroya); *id.* at 288:4–9 (Chang).

messages from the entire year of 2018,[281] and Chang had deleted potentially responsive texts from 2018 through 2019.[282]

The record on this issue is limited to Stahl's text with Saroya. The text is clear. The text references a "40 min," which was Stollmeyer's minimum. The text prior to the "40 min" was about Mindbody. The text after the "40 min" was about Mindbody. And Vista called Chang in between to discuss Mindbody. All indicators are that the communication was not about Apptio at all. It was about Mindbody.

### F. Stollmeyer Tips Vista About The Formal Sale Process.

The Guidelines required management to obtain authorization "for outbound communications to potential strategic parties,"[283] but Stollmeyer ignored them. On November 10, he texted Saroya asking to speak.[284] They talked by phone later that day.[285]

During his deposition, Stollmeyer testified that he informed Saroya during this call that Mindbody would be running a sales process: "Q. So it's your testimony today that on November 10th you notified Mr. Saroya of the process? A. Yes, I believe so."[286] Stollmeyer repeated that admission later in his deposition. When asked, "So it's fair to say

---

[281] *Id.* at 1105:11–1106:17 (Saroya).

[282] *Id.* at 246:14–247:7 (Chang).

[283] JX-489 at 2.

[284] JX-573.

[285] JX-1442.

[286] Stollmeyer Dep. Tr. at 626:12–23.

that as of November the 10th, your testimony is that you told Mr. Saroya, hey, we're going to be doing a process. Right?" Stollmeyer replied: "I believe I did."[287]

Stollmeyer's tip was yet another bad fact for Defendants. At trial, Stollmeyer tried to recant. When confronted with his deposition testimony, he stated that he had "done a lot of thinking about it," that he had been deposed for "12 to 14 hours" by the time he was asked this line of questioning and, "[a]t that point" he was "confused about dates."[288] He continued: "I'm not sure that I ever told Monti we're having a process."[289] The deposition testimony at issue, however, occurred during the morning of the second day of his deposition, not at the end of a long day. Stollmeyer could have corrected his testimony by errata sheet, but he did not do so. Circumstantial evidence makes it likely that Stollmeyer did exactly what he described in his deposition. Plaintiffs proved that Stollmeyer tipped Vista to the sales process on November 10.

There was at least one other instance in which Stollmeyer violated the Guidelines by contacting Vista. On November 17, Saroya texted Stollmeyer about an invitation to a charity event in Miami.[290] Stollmeyer replied, despite the prohibition in the Guidelines on outbound communications to potential acquirers, saying that it would be "worth the trip" and asking if he could bring his wife.[291] Stollmeyer then asked Chang if he should attend,

---

[287] *Id.* at 627:13–18.

[288] Trial Tr. at 622:9–623:3 (Stollmeyer).

[289] *Id.* at 622:9–623:3 (Stollmeyer).

[290] JX-1490 at 43.

[291] *Id.* at 44.

51

and Chang said no.[292]   That was the right answer, but Chang did not give that advice because the Guidelines plainly barred the contact.  Rather, Chang texted Stollmeyer, "The more they think or feel you're in their camp, the less $ they'll pay."[293]   Stollmeyer was undaunted: "On the other hand, I [c]an show a little leg and get them frothing at the mouth to get me and MB in the portfolio [.]"[294]   Although Stollmeyer eventually declined the invitation, the communications speak volumes as to Stollmeyer's mindset at the time.[295]

### G.      Mindbody Retains Qatalyst As Its Financial Advisor.

On November 14, 2018, the Transaction Committee convened to decide on hiring an investment banker.[296]  Vista conveyed its expression of interest on October 15.  It was now one month later, and Mindbody still had not retained a financial advisor.  Both Centerview and Qatalyst had provided advisory services to Mindbody in the past, and both were invited to pitch for the business.[297]

Centerview's presentation emphasized its experience on deals in the technology sphere, where Mindbody operated.[298]  Picking up on Stollmeyer's request for a dossier on Luxor, Centerview also cited its experience in mergers that faced activist challenges.[299]

---

[292] JX-617.

[293] *Id.*

[294] JX-552.

[295] Trial Tr. at 564:5–17 (Stollmeyer).

[296] JX-607.

[297] PTO ¶ 118.

[298] JX-595 at 12.

[299] *Id.* at 14.

Centerview depicted Mindbody as a company facing near-term challenges but with excellent long-term prospects. The near-term challenges included "Recent Execution Issues"[300] and the recent downturn in SaaS company valuations.[301] The presentation also showed the extent to which the downward changes in Mindbody's guidance negatively impacted the Company's stock price.[302] According to Centerview, this "Recent Noise" masked Mindbody's "Strong Healthy Underlying Business."[303] Centerview's calculations of Mindbody's earning potential "Impl[ied] a Significant Value Dislocation in the Market."[304] Handler agreed that these materials showed how Mindbody's depressed valuation correlated with its Q4 guidance.[305]

Turning to the sale process, Centerview explained how its approach would achieve the goal of "Keeping MINDBODY's Special Committee in Control of the Process."[306] Centerview's proposed timeline contemplated an initial phase during which Centerview and management would develop a baseline valuation. After that, Centerview would contact potential acquirers. Interested bidders would respond. If the Committee decided to pursue an offer, then the process would move toward closing.[307] According to

---

[300] *Id.* at 22.

[301] *Id.* at 24.

[302] *Id.* at 25 ("Small Revenue Re-sets – Large Stock Impact").

[303] *Id.* at 27.

[304] *Id.* at 28; Handler Dep. Tr. at 287:15–25.

[305] Handler Dep. Tr. at 291:21–292:8.

[306] JX-595 at 40.

[307] *Id.* at 56.

Centerview's presentation, the process could take somewhere between 60–190 days.[308] Lytikainen's notes suggest that Centerview saw no need for a near-term transaction and that for purposes of a sale, the "time frame is two years."[309] That comment reflected the reality that Mindbody's prospects would improve as the Company worked through its near-term challenges.

Qatalyst's pitch emphasized its experience on deals with Vista.[310] One of the slides showed potential transaction prices and highlighted $38.50 per share as corresponding to the revenue multiple Vista had paid in its Apptio acquisition.[311] Qatalyst also described Vista's ability to "move very quickly through both business and confirmatory diligence" and "to truncate processes and reduce the ability for other potential acquirers to be able to complete diligence and provide certainty at the finish line[.]"[312] Qatalyst envisioned a much quicker sale process and contemplated a closing as early as December 31 "if a party provides a pre-emptive bid that the Board finds compelling and other parties indicate lower ranges of value."[313] That comment described Vista's preferred strategy.

After the presentations from Centerview and Qatalyst, the Transaction Committee authorized the Company to engage Qatalyst.[314]

---

[308] *Id.*

[309] JX-607 at 2.

[310] JX-593.

[311] *Id.* at 30.

[312] *Id.* at 46.

[313] *Id.* at 42.

[314] JX-600 at 2.

At trial, the directors lauded Qatalyst's experience with technology companies as the basis for their choice.[315] That testimony was credible, but there is also evidence that Liaw—who knew of Stollmeyer's interactions with Vista—pushed to retain Qatalyst. The strongest proof of this fact is found in an email that Liaw sent to himself. When preparing to negotiate Qatalyst's fee, Liaw emailed himself a set of talking points that included "I lobbed this up for you guys to dunk it"; "You know I went to bat for you"; and "Everyone knows this a high probability outcome just based on the inbound interest and overall set up[.]"[316] At trial, Liaw tried to minimize the significance of these comments as containing "a degree of embellishment for the purpose of negotiating a lower fee for Mindbody," and that testimony was credible. Even discounting the statements for embellishment, it is undeniable that Liaw had advocated to retain the adviser who emphasized its relationship with Vista and recommended a quick sale process.

## H. Qatalyst Contacts Potential Buyers.

With Qatalyst's help, Mindbody identified fourteen potential buyers, including both financial sponsors and strategic acquirors.[317] Stollmeyer rejected one candidate because he didn't "want to work for a payments company."[318]

---

[315] Trial Tr. at 1903:2–19 (Herman); *id.* at 1316:19–1317:1 (Goodman); *id.* at 2029:6–13 (White).

[316] JX-614; *see also* Trial Tr. at 1486:23–1491:10 (Liaw).

[317] JX-623 at 1.

[318] JX-670; JX-671 ("Qatalyst had them on the list, and we pulled them from early outreach.").

Qatalyst planned to approach the strategic bidders beginning on November 19 and the financial sponsors beginning on November 30.[319] Qatalyst wanted to contact the strategic bidders first because they often moved slower than the financial sponsors.[320]

Under that schedule, Vista was not supposed to know that Mindbody had started a sale process until November 30 at the earliest. But Vista already knew and was ready to sprint. Vista had provided its expression of interest on October 15. Stollmeyer had tipped Vista about the process on November 10. There is even evidence that Vista gained additional insight into the schedule, because on November 27, Stahl texted a colleague that "Monti and I are going to be sprinting at Mindbody starting next week."[321]

Chang formally contacted Vista on November 30.[322] Chang did not contact the other financial sponsors until December 3 and 4.[323]

Interested buyers attended management presentations from Stollmeyer and his executive team. They met with H&F on the morning of December 11.[324] He texted his wife that the meeting "went really well. Like those guys."[325] Later that day, the team met

---

[319] JX-1138 at 36.

[320] *See* JX-625 at 1 ("As you know, sponsors will be phased in later."); *see also* Trial Tr. at 910:6–20 (Cunningham) ("[I]n my experience, this is a common thing to do.").

[321] JX-652.

[322] JX-960.

[323] *Id.*

[324] JX-730.

[325] *Id.*

with Vista.[326]  Stollmeyer joined Sheth and Saroya for drinks afterward and texted Chang: "Am with Brian and Monti at Battery.  Going great!"[327]  Stollmeyer treated the two firms differently.

## I.    Vista's Investment Committee Approves A Range.

On December 12, Saroya texted his team that Sheth wanted to convene Vista's Investment Committee on "Friday [December 14] and move fast on [Mindbody]."[328]  Vista received Bain's final market study on December 13, 2018,[329] two days before other financial sponsors gained access to Mindbody's data room.  Klomhaus testified that the Bain study gave Vista "more conviction that we knew more about the market than we otherwise would have."[330]  Another Vista deal team member later wrote, "[w]e were able to conduct all of our outside-in work before the process launched allowing us to gain conviction early that this is a must own business."[331]

At trial, Defendants stressed that when the Investment Committee met, Vista still believed that it faced competition for Mindbody.  That was true.  Saroya messaged his team on December 13 instructing them to "[s]olve for approval up to 39.  We are going to have a lot of competition on this one[.]"[332]  After learning that Vista's estimated internal rate of

---

[326] *Id.*; JX-960.

[327] JX-727.

[328] JX-744.

[329] JX-755; JX-756.

[330] Trial Tr. at 711:21–712:2 (Klomhaus).

[331] JX-968.

[332] JX-763 at 1.

return at $39 per share would be the same as the Apptio transaction, Saroya instructed his team: "I think we show 35 but ask for approval up to 40."[333]  Vista wanted the ability to compete if it ended up facing competition, but Vista also hoped that by sprinting, it could eliminate the competition.

The drafting of the Investment Committee materials corroborate that Vista knew in advance about the sale process.  An early draft of the slide deck stated that Qatalyst had informed Vista of Mindbody's sale process in "Late October 2018."[334]  That was true, and it revealed the informational advantage that Vista received.  In the final presentation, the date was adjusted to November 30, which was the official date when Qatalyst was authorized to contact financial sponsors.[335]  In between drafts, Stahl sent a text to the drafter of the deck saying "dont tell them about process."[336]

The deal team made similar changes to the summary memorandum distributed to the Investment Committee along with the presentation.  An early draft contained a lengthy description of Vista's interactions with Stollmeyer:

> In August of 2018, Monti met with Rick and introduced him to Nicolas Stahl.  The three of them had lunch in San Luis Obispo, where the Company is currently headquartered.  *Rick mentioned that he would like to find a good home for his Company and expects to stay as the CEO for 2-3 more years*, citing two qualified internal candidates who would make good successors.  In October at the CXO conference in San Diego, *Rick mentioned to Nicolas how impressed he has been with*

---

[333] *Id.* at 8.

[334] JX-739 at 6.

[335] JX-781 at 7.

[336] JX-758.

> *Robert and Vista's vision, reiterating his intention to explore a take-private for Mindbody.* Shortly after the conclusion of CXO, Rick reached out to Jeff Chang at Qatalyst Partners in order to begin preparatory work prior to kicking off a process for Mindbody after the Company's Q3 2018 Earnings Call on November 6th.[337]

The final version omitted that paragraph and stated only that Saroya and Stahl met with Stollmeyer on August 23 and that Stollmeyer attended the CXO Summit.[338] The final draft omitted Stollmeyer's other interactions with Vista and stated incorrectly that Vista first learned of a potential sale process on November 30.[339]

On December 14, Vista's Investment Committee authorized a formal bid for Mindbody.[340] No minutes or other record evidence reflects the discussion or the decision. Stahl testified that he did not recall what was said at the meeting.[341] When asked at trial whether the Investment Committee approved a range, Saroya testified that the Investment Committee approved a "cap of $35."[342]

Saroya's testimony about a cap conflicted with his instructions to his team to prepare documents to obtain approval for a range of over $35 and "ask for approval *up to 40*."[343]

---

[337] JX-1461 at 1 (emphasis added).

[338] JX-1462 at 1.

[339] *Id.*

[340] Trial Tr. at 824:13–19 (Stahl).

[341] *Id.* at 824:24–825:2 (Stahl).

[342] *Id.* at 1078:1–9 (Saroya).

[343] JX-763 at 1, 8 (emphasis added).

It is also inconsistent with a slide showing purchase prices at increasing revenue multiples up to $40/share.[344]

Saroya's testimony conflicted with the testimony of Sheth, Vista's President. Sheth explained that the Investment Committee's practice was to provide a range, not a cap, and that they followed that practice for Mindbody.[345] When presented with Sheth's testimony at trial, Saroya deferred to Sheth's recollection.[346]

Saroya's testimony conflicted with how Vista acted. Vista started the bidding at $35 per share, which would be strange if that was a cap. Saroya testified that increasing a price beyond what the Investment Committee had authorized required an additional round of approval from the Investment Committee.[347] Vista increased its bid, and Saroya had no recollection of getting an additional approval to go beyond the cap.[348]

Saroya's testimony is inconsistent with his deal team's internal communications. Vista employees took bets on what price Vista would pay to acquire Mindbody. This came out in trial through a text from Stahl to Saroya, which attached a photo that Stahl called "[t]he line."[349] The image had a line set at $37.50—halfway between $35 and $40.[350] Vista

---

[344] JX-781 at 11.

[345] Trial Tr. at 1570:23–1571:23 (Sheth).

[346] *Id.* at 1225: 2–5 (Saroya).

[347] *Id.* at 1078:10–13, 1222:8–1123:4 (Saroya).

[348] *Id.* at 1226:1–6 (Saroya).

[349] JX-883 at 1–2.

[350] *Id.* at 2.

employees submitted their over-under guesses of the eventual deal price.[351]  The lowest prediction was $36.50, and the highest prediction was $40.[352]  Over half of the participating employees guessed that the price would be greater than $37.50.[353]  The highest prediction by a deal team member was $38.50/share.[354]  In response to this image, Saroya said, "37.5 is a good guess[.]"[355]  Stahl replied, "I thought so too."[356]

In light of this evidence, Saroya's testimony about a cap at $35 per share was not credible.  The Investment Committee approved a bidding range that went up to $40 per share.

### J. Mindbody Grants Data Room Access To Potential Acquirers.

Ultimately, seven parties signed non-disclosure agreements and gained access to Mindbody's data room.[357]  The data room opened on December 15.[358]  All parties received the same documents, which were designed to provide what a generic private equity fund would want to have for its "first-level diligence."[359]  Parties began dropping out after receiving data room access.[360]

---

[351] *Id.*

[352] *Id.*

[353] *Id.*

[354] Trial Tr. at 835:11–24 (Stahl).

[355] JX-883 at 3.

[356] *Id.* at 5.

[357] JX-787 at 1.

[358] *Id.*

[359] JX-1221; Trial Tr. at 307:15–308:2 (Chang); *id.* at 2050:13–21 (White).

[360] JX-886 at 3.

Vista moved forward. Stahl testified at trial that Vista's outlook on Mindbody's value initially soured after gaining access to the data room,[361] because "there was less near-term growth than what we have previously anticipated."[362] Stahl testified that Vista also had concerns about Mindbody's customer retention, its ability to upsell products to customers, declining organic revenue, and competitive threats.[363] The contemporaneous evidence shows that like Mindbody management, Vista viewed those issues as near-term hurdles that the Company could overcome. After processing the information from the data room, Saroya texted Sheth that "our key finding is that if we fix the go to market engine we can accelerate growth meaningfully" and that "we will be lined up to preempt after you and I discuss."[364] Saroya minimized the near-term challenges that the Company faced, stating, "[w]e see the same issues in most of these businesses."[365]

Vista became more excited after meeting with Mindbody's sales team.[366] Stahl texted Saroya that "the sale strategy was terrible and they have started fixing a lot of things."[367] Stahl believed that Vista could achieve significant long-term gains after buying Mindbody.[368]

---

[361] Trial Tr. at 748:11–754:21 (Stahl).

[362] *Id.* at 748:17–749:5 (Stahl).

[363] *Id.* at 748:2–749:8 (Stahl).

[364] JX-820 at 1.

[365] *Id.* at 3.

[366] JX-852.

[367] JX-855.

[368] Trial Tr. at 748:17–749:5 (Stahl).

### K. Vista Makes A Formal Offer.

On December 18, 2018, three days after the data room opened, Vista submitted an offer to acquire the Company for $35 per share.[369] Vista imposed a 24-hour deadline for acceptance. After that, the offer would expire. Vista conditioned its offer on Stollmeyer and IVP entering into a voting and support agreement.[370]

That same day, Stahl sent Saroya the photo of the bidding line at $37.50, and Vista employees began betting on the final price.[371] In his deposition, Stahl testified that the guesses were just a "game" that "wasn't based on anything."[372] At trial, Saroya claimed to not recall what the "line" was even about.[373] Saroya's other texts give him away. Referring to a bet of $40 per share by an employee named Luke, he wrote, "Luke has no faith in me huh."[374]

The Transaction Committee convened on December 19, 2018, to discuss Vista's offer of $35 per share.[375] Later that day, the Transaction Committee directed Qatalyst to communicate to all potential bidders that there was pressing need for them to submit prompt indications of interest.[376] The remaining potential bidders were much further

---

[369] JX-825.

[370] *Id.* at 1.

[371] JX-883 at 2.

[372] Stahl Dep. Tr. at 112:23–113:22.

[373] Trial Tr. at 1227:9–16 (Saroya).

[374] JX-883 at 4.

[375] JX-1729.

[376] JX-1138 at 39.

behind in their diligence than Vista. One Qatalyst employee emailed Chang on December 19 to note that one bidder, Thoma Bravo, was not as far in their process: "They are just much further behind in their thinking. . . . Level of questions is much more basic so far."[377]

Thoma Bravo dropped out of the process on December 20.[378] Evidencing that Vista continued to have privileged access to what was happening in the deal process, Vista had expected to learn after 3:00 p.m. Pacific Time that day whether Thoma Bravo had submitted a bid.[379]

Another bidder, Recruit, was also still early in diligence.[380] Recruit's impression from the management presentation was that Stollmeyer seemed "checked out."[381] Stollmeyer told Centerview that he was uncomfortable with Recruit because he did not want to work with a Japanese company, as they required a translator.[382]

By December 20, only Vista and one other bidder, H&F, remained.[383] Qatalyst had initiated follow-up calls with H&F on Mindbody's go-to-market and financial performance, but H&F had not submitted an offer.[384]

---

[377] JX-876 at 1.

[378] JX-895.

[379] JX-902; JX-903.

[380] JX-877.

[381] JX-1605.

[382] Trial Tr. at 72:18–74:6 (Friedman).

[383] JX-886 at 3.

[384] JX-885 at 5.

## L.    Mindbody Counters And Vista Makes A "Best And Final Offer."

Mindbody's Board convened on December 20 to discuss Vista's initial offer with Qatalyst.[385]  During the meeting, the Board authorized Qatalyst to make a counteroffer of $40 per share.[386]  Qatalyst had recommended that figure,[387] which matched both the top of Vista's range and the number that Stollmeyer had said he wanted.

After receiving the counter, Saroya circulated a slide within Vista that identified potential synergies with other Vista portfolio companies.[388]  He wrote that "[o]ur team believes these synergies allow us to move up on our initial bid."[389]  At trial, Saroya claimed that the model presented to the Investment Committee only supported a maximum price between $36 and $37 per share and that he did not recall any discussion about a higher range.[390]  The evidence shows that the Investment Committee had already given Saroya authority to go above $35 per share.

On December 20, Vista bumped to $36.50 per share. Vista described its bid as its "best and final" offer, but the evidence shows that Vista could and would gone higher if it had been pressured to do so.  Qatalyst first contacted Stollmeyer to communicate the

---

[385] JX-885.

[386] *Id.* at 2.

[387] JX-884 at 2.

[388] JX-914.

[389] *Id.* at 1.

[390] Trial Tr. at 1090:5–16 (Saroya).

65

offer.[391]  Stollmeyer then texted Liaw that Vista had given their "best and final" offer of $36.50.[392]  Liaw responded, "I'm kind of disappointed actually . . . ."[393]

Qatalyst reached out to H&F on December 21.[394]  H&F responded that they were "processing" and would need "2 more weeks to sign" up a transaction.[395]  On price, H&F told Qatalyst that they had "no path to $40."[396]

At this point, the Transaction Committee seemed to discontinue meeting, and the full Board convened to discuss Vista's $36.50 per share bid on December 21.[397]  Without other bidders, the Board had to decide whether or not to take Vista's bid of $36.50.  On December 21, Liaw told his partners that he "personally thought Vista would get up to $38," but that the market volatility and lack of other interested buyers made [$36.50] the most attractive offer.[398]  Goodman thought $36.50 per share was "an excellent price that would derisk the future for our shareholders."[399]  Smith thought that the premium "was definitely worth accepting versus the uncertainty of potentially several years of uncertain execution."[400]

---

[391] *Id.* at 455:14–23 (Stollmeyer).

[392] JX-890; JX-891.

[393] JX-892.

[394] JX-906 at 1–2.

[395] JX-951.

[396] *Id.*

[397] JX-906.

[398] JX-904.

[399] Trial Tr. at 1347:19–1348:3 (Goodman).

[400] *Id.* at 2188:21–2189:17 (Smith).

The deal price of $36.50 per share represented a premium of approximately 68% over the closing price of Mindbody's Class A common stock on December 21.[401] Qatalyst said it could render a fairness opinion for the $36.50 per share offer.[402] On December 21, the Board directed management to accept the bid and negotiate a merger agreement.[403]

## M. The Parties Sign The Merger Agreement.

On December 23, 2018, the Board approved the Agreement and Plan of Merger (the "Merger Agreement"), and the parties signed it.[404] If the Merger closed, then each share of Mindbody common stock would be converted into the right to receive $36.50 per share in cash, subject to the stockholder's right to eschew the merger consideration and seek appraisal.[405] Stollmeyer and IVP agreed vote shares carrying 32.1% of Mindbody's outstanding voting power in favor of the Merger.[406]

The Merger was publicly announced on December 24, 2018.[407] Immediately after announcement, Stollmeyer texted his financial advisor: "Vista's in love with me (and me with them). No retirement in my headlights."[408]

---

[401] JX-1138 at 42.

[402] JX-921 at 1.

[403] JX-906 at 1–2.

[404] PTO ¶ 3.

[405] *Id.*

[406] *Id.* ¶ 120.

[407] *Id.* ¶ 121.

[408] JX-956; *see also* JX-954 ("Vista loves me and wants us to step on the gas. No retirement in my headlights."); JX-958 ("Best part – they want me to still run the company. Merry Christmas[.]").

In an internal email, Vista's Mike McMullan described how Vista had secured the deal. He bragged that Vista was "able to conduct all of our outside-in work before the process launched," which enabled Vista "to move swiftly in the process to provide the MINDBODY Board with a highly certain offer within 3 days of receiving data room access."[409]

### N. The Go-Shop

The Merger Agreement authorized a 30-day go-shop.[410] Beginning on Christmas Eve, Qatalyst reached out to 52 potential bidders, 38 of which were entities that were not part of the sale process.[411] Only eight received the management presentation and signed a non-disclosure agreement. Only two expressed interest in continuing diligence thereafter.[412]

On January 5, 2019, Stollmeyer informed Vista that Luxor and another large stockholder were trying to put together a bid.[413] Stollmeyer told Vista that it was a "low likelihood" outcome because those parties "likely could only write $100-200mm checks."[414] Stollmeyer conceded at trial that he should not have revealed this information to Vista.[415] In any event, Luxor refused to sign an NDA, and Friedman admitted at trial

---

[409] JX-968.

[410] PTO ¶ 122.

[411] JX-1138 at 41.

[412] JX-1015 at 3.

[413] JX-1038.

[414] *Id.*

[415] Trial Tr. at 663:19–665:1 (Stollmeyer).

that Luxor wanted to preserve the ability to vote against the merger and bring an appraisal claim in the future.[416] No bid emerged.

On January 6, halfway through the go-shop process, Stollmeyer went on vacation to Costa Rica.[417] He instructed management in an email to decline go-shop presentations in his absence, "[u]nless it's urgent."[418] Stollmeyer was signaling his lack of interest in a competing offer.

### O. The Proxy Materials

The Merger Agreement granted Vista rights and obligations related to the preliminary proxy, the definitive proxy, and any subsequent supplemental disclosures (all together, the "Proxy Materials"). The parties agreed that the Proxy Materials must not "contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not false or misleading." [419] Section 6.3(b) gave Vista the right to "a reasonable opportunity to review and comment" on the Proxy Materials before they were filed.[420] The Merger Agreement mandated that Mindbody "may not file the Proxy Statement or any Other Required Company Filing with the SEC without first providing [Vista] and its counsel a reasonable opportunity to review and comment

---

[416] *Id.* at 128:13–129:6 (Friedman).

[417] JX-1489 at 42.

[418] *Id.*

[419] *Id.*

[420] JX-1138 at 157.

thereon[.]"[421] Section 6.3(d) obligated Vista to notify Mindbody if it became aware of any facts that, if not disclosed, would render the Proxy Materials materially misleading or incomplete.[422]

Saroya and Stahl both received a summary of Mindbody's proposed "Background of the Merger" section.[423] Both the summary and the version filed with the SEC stated only that "[i]n October 2018, representatives of Vista and Mr. Stollmeyer discussed Vista's investment strategy and the firm's interest in learning more about MINDBODY's approach to the fitness, beauty and wellness services industries."[424] The preliminary proxy omitted any references to Stollmeyer's meeting with in August, Stollmeyer's attendance at the CXO Summit in October, or Vista's expression of interest on October 15.[425] Nevertheless, Stahl replied that the description "makes sense to me," and Saroya replied, "This works."[426]

Mindbody filed the preliminary proxy on January 9, 2019.[427] Stahl texted Saroya on January 10 to remind him to stick to their story, which required saying that "Jeff [Chang] called you on 11/30 inviting us into the process[.]"[428]

---

[421] *Id.* at 157.

[422] *Id.* at 158.

[423] JX-1044.

[424] JX-1058 at 26.

[425] *Id.*

[426] JX-1044 at 1.

[427] JX-1058.

[428] JX-1066.

70

On January 11, Luxor filed a Schedule 13D stating that the proposed Merger Agreement "significantly undervalues" Mindbody.[429] On January 14, Friedman spoke to Stollmeyer and asked him why Mindbody had guided down for Q4.[430] Stollmeyer responded that he had "kitchen-sinked" the guidance.[431] On January 18, 2019, Mindbody stockholder Luxor issued a demand for books and records under 8 *Del. C.* § 220 seeking, among other things, "the Company's actual or anticipated Q4 performance, including subscriber accounts by tier."[432]

Stahl and Klomhaus also received a copy of Mindbody's proposed definitive proxy.[433] Klomhaus did not have any comments or edits.[434] Stahl noted that he had "had some discussions" with counsel about the documents and wanted to review the changes.[435] At trial, Stahl testified that he did not believe there were any undisclosed aspects of the Merger that should have been disclosed.[436] Like the preliminary proxy, the definitive proxy omitted any reference to Stollmeyer's meeting with Vista in August, Stollmeyer's

---

[429] JX-1077.

[430] Trial Tr. at 79:24–80:23 (Friedman).

[431] *Id.*; *id.* at 82:8–19 (Friedman).

[432] JX-1111 at 9.

[433] JX-1139.

[434] *Id.*

[435] *Id.*

[436] Trial Tr. at 774:2–10 (Stahl).

71

attendance at the CXO Summit in October, or Vista's expression of interest on October 16.[437]

Stollmeyer reviewed and signed the definitive proxy as CEO.[438] On January 23, 2019, Mindbody filed the definitive proxy with the SEC.[439]

## P. The "Massive Beat"

On January 4, 2019, Mindbody determined preliminarily that its Q4 revenue had come in around $68.3 million.[440] Stollmeyer texted White that day, "$68.3M Q4. Awesome!"[441] He advised his management team that this figure reflected 37% growth year over year and a "massive beat against the Street's $66 million consensus midpoint."[442]

On January 6, Stollmeyer texted White again about the Q4 results: "One question: should we plan one last Earnings Call? My script: 'here's our big beat. Adios mutha f******s.'"[443]

On January 24, after Mindbody filed the definitive proxy, White emailed the Audit Committee to convey his belief that Mindbody should disclose the preliminary Q4 results.[444] White noted that Q4 revenue "exceeded consensus pretty meaningfully" and

---

[437] JX-1138 at 26.

[438] *Id.* at 183; Trial Tr. at 466:11–20 (Stollmeyer).

[439] PTO ¶ 9; JX-1138.

[440] JX-1037 at 2.

[441] JX-1032.

[442] JX-1037 at 1.

[443] JX-1042 (text altered).

[444] JX-1141 at 1.

that the information should be publicly released by February 7 "so the shareholders have the information before they vote" on February 14.[445] Liaw agreed but expressed concern that Luxor "may use this information to bolster their position[.]"[446] Smith also expressed concern about the effect of the disclosure on the Merger vote: "What happens (hypothetically) if the vote fails on Feb. 14th? Just want to understand that first."[447] By asking about the effect on the vote, they demonstrated that they thought the information could be important for the vote.

By January 31, Mindbody's outside counsel had drafted a press release announcing the preliminary Q4 results.[448] As required by the Merger Agreement, Mindbody sent the draft to Vista.[449] After speaking with outside counsel, Klomhaus asked Stahl for "a minute to chat about my concerns."[450]

The Audit Committee met on February 6.[451] Mindbody's outside counsel reported on Vista's position.[452] The Audit Committee voted against disclosing the Q4 results, Neither the discussions nor the purported determination appear in the minutes.[453]

---

[445] *Id.*

[446] *Id.*

[447] *Id.*

[448] JX-1165; JX-1463.

[449] JX-1165.

[450] *Id.*

[451] JX-1188.

[452] Trial Tr. at 2140:15–19 (White).

[453] *Id.* at 2185:21–2186:12 (Smith).

73

During this litigation, the Audit Committee members provided several reasons for their recommendation. Both Liaw and Smith testified that they were concerned with setting a precedent of pre-announcing quarterly results if the Merger failed.[454] The fact that a merger vote was pending provided an obvious distinction from ordinary course situations. There was also already information in the market on the subject, because Mindbody had issued the Proxy Materials that included Mindbody's 2019 projections.[455] If the Merger failed, Mindbody would not be in the same position for future quarters.

Herman, Smith, and Cunningham all testified at trial that the amount of the revenue beat was not material.[456] That testimony is hard to square with Stollmeyer and White's contemporaneous reactions, and it is inconsistent with Company counsel's preparation of a press release that would announce the results. This is another issue on which Stollmeyer changed his testimony at trial. He had acknowledged in his deposition that this information would be material to an investor, but he maintained at trial that the information would not be material to a stockholder voting on the Merger.[457]

---

[454] *Id.* at 1463:2–20 (Liaw); *id.* at 2184:4–2185:20 (Smith).

[455] JX-1138 at 51.

[456] Trial Tr. at 1971:18–1972:1 (Herman); *id.* at 2178:11–2179:23 (Smith); *id.* at 949:1–18 (Cunningham).

[457] Stollmeyer Dep. Tr. at 527:14–21, 830:9–831:13.

Liaw, White, and Smith also testified that releasing the Q4 results, without context, would be misleading to investors.[458]  It is not clear why that would be true.  Investors know what preliminary results are.  Regardless, the draft press release provided context.[459]

## Q. Litigation Ensues.

Before the Merger closed, Mindbody stockholders filed federal securities class actions in California and Delaware.[460]  In the Court of Chancery, Mindbody stockholders Philip Ryan, Jr. and Donald Friedman filed suit under 8 *Del. C.* § 225 challenging the validity of the stockholder vote (the "Section 225 Action").[461]  The next day, Luxor filed an enforcement action in this court under 8 *Del. C.* § 220 to obtain books and records concerning the Merger (the "Section 220 Action").[462]

To moot the federal suits and aspects of the Section 225 Action, Mindbody issued supplemental disclosures (the "Supplemental Disclosures").[463]  As with the previous SEC filings related to the Merger, Vista had the opportunity to review the Supplemental Disclosures before filing.  Multiple Vista personnel, including Saroya and Stahl, received a copy before filing.[464]  Vista's outside counsel said they were "scrubbing one more

---

[458] Trial Tr. at 1463:21–1465:9 (Liaw); *id.* at 2090:17–2091:22 (White); *id.* at 2184:4–2185:20 (Smith).

[459] JX-1165; JX-1463.

[460] JX-1194 at 3.

[461] PTO ¶ 19.

[462] *Id.* ¶ 20.

[463] JX-1194 at 3–7, 50–83.

[464] JX-1192 at 1.

time."[465] On February 7, Mindbody issued the Supplemental Disclosures, which added details about the sale process and other issues.[466]

ISS and Glass Lewis recommended that stockholders vote for the transaction.[467] Analysts also supported the Merger.[468] The stockholders approved the Merger during a special meeting on February 14, 2019.[469] The Merger closed the next day.[470]

### R. Vista Hires Stollmeyer.

On February 17, two days after the Merger closed, Stollmeyer retained employment counsel and began negotiating with Vista over the terms of his post-acquisition employment. Unlike the formal sale process, those negotiations took months.[471]

The terms of Stollmeyer's post-deal employment resembled his pre-deal employment. Stollmeyer took the same salary and bonus in 2019.[472] He received a stock grant equal to 1.7% of the post-transaction equity, assuming full vesting and no forfeiture.[473]

---

[465] *Id.*

[466] JX-1194.

[467] JX-1172.

[468] *See, e.g.*, JX-551; JX-945; JX-969; JX-1181.

[469] PTO ¶¶ 16–17.

[470] *Id.* ¶ 1.

[471] JX-1218; JX-1302; JX-1303; JX-1304; JX-1305.

[472] JX-1305; Trial Tr. at 474:19–22 (Stollmeyer).

[473] JX-1304; JX-1330; JX-1410 at 17.

### S. This Litigation Takes The Main Stage.

After the Merger closed, the litigation landscape shifted. Mindbody produced documents in response to the Section 220 action, which Luxor voluntarily dismissed in August 2019.[474]

The Section 225 Action moved forward, with discovery concluding in April 2019.[475] That same month, Luxor filed an appraisal petition (the "Appraisal Action").[476] In June 2019, Luxor filed a class action lawsuit alleging breach of fiduciary duty claims against Stollmeyer, White, and Liaw (the "Luxor Action").[477]

In October 2019, the court consolidated the Section 225 Action, the Appraisal Action, and the Luxor Action into this proceeding. The court named Luxor as the lead plaintiff for purposes of the claims raised in the Luxor Action but permitted the plaintiffs who had filed the Section 225 Action to continue pursuing the Section 225 claim.

The Section 225 claim moved forward rapidly, and the court held a trial on a paper record on December 9, 2019.[478] After trial, the parties then agreed to a settlement of the Section 225 claim, which the court approved on December 15, 2020.[479]

---

[474] PTO ¶ 20.

[475] *Id.* ¶ 23.

[476] *Id.* ¶ 24. The court will address Luxor's appraisal petition in a later decision to the extent necessary.

[477] *Id.* ¶ 27.

[478] *Id.* ¶¶ 23, 32

[479] *Id.* ¶ 35.

Luxor amended its complaint to strengthen its claims for breach of fiduciary duty, and the defendants moved to dismiss.[480] The court issued a decision that dismissed the claims against Liaw and otherwise denied the motion.[481] The decision noted that Liaw's dismissal was without prejudice and that "[i]f discovery shows that [Liaw] had a more significant and compromising role, then subject to the law of the case doctrine, [the plaintiff] can seek to revisit [Liaw's] dismissal, should future developments provide a compelling reason for doing so."[482] Stollmeyer and White filed answers and discovery ensued.[483]

After fact discovery closed, Luxor sought leave to amend its complaint. After receiving leave, Luxor filed the operative complaint on July 27, 2021.[484] It dropped White as a defendant, reasserted claims against Liaw, and added aiding and abetting claims

---

[480] *Id.*

[481] *In re Mindbody, Inc.*, 2020 WL 5870084 (Del. Ch. Oct. 2, 2020) [hereinafter, "Dismissal Decision"].

[482] *Id.* at *34 n.309 (quoting *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *43 (Del. Ch. June 11, 2020)).

[483] PTO ¶ 39.

[484] *Id.*

against IVP and Vista.[485]  Liaw, IVP, and Vista moved for dismissal.[486]  Stollmeyer moved

for summary judgment.[487]  The court denied all three motions.[488]

Liaw and IVP agreed to a settlement, which the court approved.[489]  That left only

Stollmeyer and Vista as defendants.

The court held trial February 28, 2022, through March 9, 2022.[490]  Post-trial briefing

concluded on July 14, 2022, and post-trial argument was heard on July 28, 2022.[491]  The

parties submitted their joint schedule of evidence on August 11, 2022.[492]

## II.    LEGAL ANALYSIS

Stollmeyer was an officer and director of a Delaware corporation.  In each capacity,

he owed duties of loyalty and care to the corporation and its stockholders as residual

claimants.[493]  As a function of those duties, Stollmeyer owed a duty to disclose all material

---

[485] *Id.* ¶ 40.

[486] *Id.* ¶ 42.

[487] *Id.* ¶ 43.

[488] *Id.* ¶¶ 45–46.  *See* Dkts. 398, 399, 401 (*In re Mindbody, Inc., S'holder Litig.*, 2021 WL 5565172 (Del. Ch. Nov. 29, 2021); *In re Mindbody, Inc., S'holder Litig.*, 2021 WL 5564687 (Del. Ch. Nov. 29, 2021); *In re Mindbody, Inc., S'holder Litig.*, 2021 WL 5834263 (Del. Ch. Dec. 9, 2021)).

[489] Dkt. 481.

[490] Dkts. 461–68.

[491] Dkt. 477 ("Pls.' Opening Post-Trial Br."); Dkt. 478 ("Defs.' Opening Post-Trial Br."); Dkt. 484 ("Pls.' Answering Post-Trial Br."); Dkt. 485 ("Defs.' Answering Post-Trial Br."); Dkt. 493 ("Post-Trial Oral Arg. Tr.").

[492] Dkt. 492.

[493] *In re Rural Metro Corp.*, 88 A.3d 54, 80 (Del. Ch. 2014); *In re McDonald's Corp. S'holder Deriv. Litig*, 2023 WL 387292, at *13–15 (Del. Ch. Jan. 26, 2023).  In his capacity as a director, Stollmeyer was protected by an exculpatory charter provision, which means

79

information in connection with the Merger.[494]  Plaintiffs claim that Stollmeyer breached his fiduciary duties by tilting the sale process in Vista's favor and by failing to disclose material information.  Plaintiffs contend that Vista aided and abetted those breaches.

### A.    The Claims Against Stollmeyer

When determining whether corporate fiduciaries have breached their duties, a court applying Delaware law evaluates their conduct through the lens of a standard of review.[495] The standard of review informs the evidentiary burden and provides a framework for legal analysis.  Here, the parties identified an abundance of potential and, at times, competing legal standards for the claims against Stollmeyer.  To chart an analytical course as to those claims, this decision begins by outlining the complex system of potential legal standards implicated by the parties' arguments.

---

that Plaintiffs would have to prove that Stollmeyer acted disloyally or in bad faith to prevail on a claim against him as a director.  Mindbody's exculpatory charter provision did not protect Stollmeyer from liability when he was acting as an officer.  Generally, when a defendant acted in both exculpated and unexculpated capacities, the court must distinguish in which capacity the defendants acted to resolve the claim for liability.  *See, e.g.*, *In re Oracle Corp. Deriv. Litig.*, 2021 WL 2530961, at *2 (Del. Ch. June 21, 2021).  Because Plaintiffs have proven that Stollmeyer acted disloyally, however, this decision need not make that distinction and the exculpatory charter provision plays no role in the legal analysis.

[494] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992) ("[The duty of candor] represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.").

[495] *See Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013).

Delaware law has three transactional standards of review: the business judgment rule, enhanced scrutiny, and entire fairness.[496]

Where a stockholder challenges a change-of-control transaction like an all-cash merger, enhanced scrutiny supplies the presumptive standard of review. In an M&A setting, the key features of the enhanced scrutiny test require "(a) a judicial determination regarding the adequacy of the decision[-]making process employed by the directors, including the information on which the directors based their decision; and (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing."[497] The defendant fiduciaries bear the burden of proof on both elements.[498]

Where enhanced scrutiny under *Revlon* presumptively applies, defendant fiduciaries can invoke *Corwin* to lower the standard to an irrebuttable version of the business judgment rule. To lower the standard, the transaction must have been "approved by a fully informed, uncoerced majority of the disinterested stockholders."[499] A single disclosure deficiency will defeat *Corwin* cleansing.[500] The plaintiff bears the initial burden of identifying alleged

---

[496] *Chen*, 87 A.3d at 666 (quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)).

[497] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994).

[498] *Id.*

[499] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 305–06 (Del. 2015).

[500] *In re Xura, Inc. S'holder Litig.*, 2018 WL 6498677, at *12 (Del. Ch. Dec. 10, 2018); *van der Fluit v. Yates*, 2017 WL 5953514, at *8 n.115 (Del. Ch. Nov. 30, 2017).

disclosure problems, but the defendants bear the burden of proving at trial that the stockholder vote was fully informed.[501]

Where a conflicted fiduciary uses their position to mislead a board in a sale process, committing "fraud on the board," there are other potential legal frameworks for evaluating the claim. One framework incorporates the conduct that constituted fraud on the board as part of an analysis using the entire fairness standards of review.[502] Another framework examines whether the plaintiff proved the traditional elements of a claim for common law or equitable fraud, but with the focus on the board rather than the plaintiff as the victim.[503] The different frameworks have different approaches to burden allocation.

---

[501] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7–8 (Del. Ch. Jan. 5, 2017).

[502] *See* Dismissal Decision at *25 n.229 (discussing cases); *see also Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary III)*, 663 A.2d 1156, 1170 n.25 (Del. 1995) (suggesting that, when the default standard of review is the business judgment rule, fraud on the board causes the standard of review to escalate to entire fairness); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283–84 & n.33 (Del. 1989) (suggesting that, where enhanced scrutiny applies, fraud on the board causes the standard of review to escalate to entire fairness). Applying a traditional fiduciary standard makes the most sense when evaluating how a proven fraud on the board affects the potential liability of defendant fiduciaries who were misled or manipulated by the fraudster. In that scenario, if the fiduciaries can satisfy the transactional standard, then they did not breach their duties, regardless of having been misled or manipulated. If the misled or manipulated directors cannot prove that the transaction satisfied the fiduciary standard of review, then they have committed a fiduciary breach, albeit likely a breach of the duty of care for which they would be exculpated.

[503] *See Firefighters' Pension Sys. of City of Kansas City, Missouri Trust v. Presidio, Inc.*, 251 A.3d 212, 274–55 (Del. Ch. 2021) (citing Joel Edan Friedlander, *Confronting the Problem of Fraud on the Board*, 75 Bus. Law. 1441 (2020)). There is merit to treating fraud on the board as a separate theory of liability that can be committed by anyone, including a non-fiduciary. *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 865 (Del. 2015) (explaining that trial court's award of money damages against a contractual counterparty,

In certain circumstances, a plaintiff can pursue a claim for breach of the duty of disclosure as an independent path to liability.[504] When a corporation seeks stockholder action, the duties of loyalty and care manifest themselves contextually in a "duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action[.]"[505] Unlike under *Corwin*, where the defendants have the burden of proof, the plaintiff bears the burden of proving the elements of a disclosure claim.[506]

In briefing, the parties grappled with the complicated surfeit of standards described above. Plaintiffs briefed enhanced scrutiny, entire fairness, and disclosure as independent paths to liability.[507] Stollmeyer argued that enhanced scrutiny is the presumptive standard, but that *Corwin* cleansing applies, resulting in an irrebuttable version of the business judgment rule governing the case.[508] The parties' respective positions read like a legal

---

a financial advisor, "was premised on [the financial advisor]'s 'fraud on the Board'"). Ultimately, fraud-on-the-board theory is a developing area of Delaware law, which this decision does not address given the selected legal standard.

[504] When entire fairness applies, disclosure becomes one element of the fair process dimension, rather than an independent claim for fiduciary breach. *See, e.g.*, *Weinberger*, 457 A.2d at 711 ("Part of fair dealing is the obvious duty of candor . . . . [O]ne possessing superior knowledge may not mislead any stockholder by use of corporate information to which the latter is not privy.").

[505] *Stroud*, 606 A.2d at 84.

[506] *Solomon v. Armstrong*, 747 A.2d 1098, 1128 (Del. Ch 1999) ("As far as claims of material misstatements, omissions, and coercion go, the law is clear that plaintiff bears the burden of proof that disclosure was inadequate, misleading, or coercive.").

[507] *See* Pls.' Opening Post-Trial Br. at 68–83; Pls.' Answering Post-Trial Br. at 15–40.

[508] *See* Defs.' Opening Post-Trial Br. at 52–58; Defs.' Answering Post-Trial Br. at 12–13.

version of a choose-your-own-adventure story, where all of Plaintiffs' adventures lead to liability and all of Stollmeyer's adventures lead to exoneration.

For a court, a one-adventure approach is desirable. This decision applies the approach urged by Stollmeyer—addressing Plaintiffs' claims against Stollmeyer under *Revlon*, evaluating the viability of *Corwin*, and assessing disclosure as an independent path to liability.[509] Adopting Stollmeyer's approach, this decision finds that the conduct leading to the Merger fell outside of the range of reasonableness.

Notably, there is a conflict between the allocation of the burden of proof on *Corwin* cleansing and the claim for breach of the duty of disclosure. Rather than conducting the analysis twice, once with the burden of proof on Stollmeyer under *Corwin* and once with the burden of proof on Plaintiffs for the breach of fiduciary duty claim, this decision conducts the analysis once with the burden on Plaintiffs. Using that framework, this decision finds that *Corwin* cleansing is not available because Stollmeyer failed to disclose material information. That finding also provides the predicate for Plaintiffs' claim for breach of the duty of disclosure. Because Plaintiffs prevail, allocating the burden of proof to them proves inconsequential to the outcome and avoids the need to analyze the disclosure issues twice.

---

[509] This approach has the added benefit of aligning the court's legal analysis with the parties' focus in briefing. *Compare* Pls.' Opening Post-Trial Br. at 68–74 (devoting six pages to addressing *Revlon* arguments) and Defs.' Opening Post-Trial Br. at 62–94 (devoting over thirty pages to addressing same), *with* Pls.' Opening Post-Trial Br. at 80–83 (devoting fewer than three pages to addressing entire fairness arguments) and Defs.' Opening Post-Trial Br. at 59–63 (devoting fewer than four pages to addressing same).

### 1. The Sale-Process Claim

Under *Revlon*, "'directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there.'"[510] The question posed is whether the fiduciaries have exercised their powers "in the service of a specific objective: maximizing the sale price of the enterprise."[511] Generally speaking, to satisfy enhanced scrutiny under *Revlon*, defendants bear the burden of demonstrating both (i) the reasonableness of the decision making process employed by the directors, including the information on which the directors based their decision, and (ii) the reasonableness of the directors' action in light of the circumstances then existing.[512]

Under Delaware law, "[w]hen directors bias the process against one bidder and toward another not in a reasoned effort to maximize advantage for the stockholders, but to tilt the process toward the bidder more likely to continue current management, they commit a breach of fiduciary duty."[513] This is also true when a single board member causes the board to favor a bidder "not in a reasoned effort to maximize advantage for the

---

[510] *In re Answers Corp. S'holders Litig.*, 2011 WL 1366780, at *3 (Del. Ch. Apr. 11, 2011) (quoting *In re Dollar Thrifty S'holder Litig.*, 2010 WL 5648895, at *17 (Del. Ch. Sept. 8, 2010)).

[511] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) (citing *Revlon*, 506 A.2d at 183); *see also Revlon*, 506 A.2d at 182–83 (explaining that, in the change-of-control context, the duty of loyalty requires "the maximization of the company's value at a sale for the stockholders' benefit"); *Paramount*, 637 A.2d at 44 ("In the sale of control context, the directors must focus on one primary objective—to secure the transaction offering the best value reasonably available for the stockholders—and they must exercise their fiduciary duties to further that end.").

[512] *Paramount*, 637 A.2d at 45.

[513] *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 64 (Del. Ch. 2007).

stockholders," but because of "personal reasons."[514] "The sins of just one fiduciary can support a viable *Revlon* claim."[515] Thus, "the paradigmatic context for a good *Revlon* claim . . . is when a supine board under the sway of an overweening CEO bent on a certain direction[] tilts the sales process for reasons inimical to the stockholders' desire for the best price."[516] Reframed more generally, "the paradigmatic *Revlon* claim involves a conflicted fiduciary who is insufficiently checked by the board and who tilts the sale process toward his own personal interests in ways inconsistent with maximizing stockholder value."[517]

When a plaintiff proves a paradigmatic *Revlon* claim, that showing calls into question the reasonableness of the decision-making process employed and the reasonableness of the directors' action in light of the circumstances then existing.

Plaintiffs proved that this case fits the paradigm. Stollmeyer suffered a disabling conflict because he had an interest in near-term liquidity, a desire to sell fast, and an expectation that he would receive post-Merger employment accompanied by significant equity-based incentives as a Vista CXO. Stollmeyer tilted the sale process by strategically driving down Mindbody's stock price and providing Vista with informational and timing

---

[514] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 2021 WL 772562, at \*41 (Del. Ch. Mar. 1, 2021).

[515] Dismissal Decision at \*14 (citing *Kahn v. Stern*, 183 A.3d 715, 2018 WL 1341719, at \*1 n.4 (Del. 2018) (ORDER)); *MacMillan*, 559 A.2d at 1283; *Xura*, 2018 WL 6498677, at \*13; *Toys "R" Us*, 877 A.2d 975, 1002–03 (Del. Ch. 2005).

[516] 877 A.2d at 1002 (quoted favorably in *Kahn*, 2018 WL 1341719, at \*1 n.4)).

[517] Dismissal Decision at \*13.

advantages during the due-diligence and go-shop periods. And the Board failed to adequately oversee Stollmeyer.

Because facts concerning the sale-process breaches were not disclosed to stockholders, the stockholder vote was not fully informed. Defendants, therefore, are not entitled to *Corwin* cleansing and Plaintiffs have provide their disclosure claim against Stollmeyer.

### a. Stollmeyer Suffered Disabling Conflicts.

"Delaware law recognizes that liquidity is one benefit that may lead directors to breach their fiduciary duties if a desire to gain liquidity caused them to manipulate the sales process and subordinate the best interests of the corporation and the stockholders as a whole."[518] "Delaware law also recognizes that management's prospect of future employment can give rise to a disabling conflict in the sale context."[519] "Regardless of the underlying theory, the key in evaluating whether financial interests gave rise to a disabling conflict is to look to the subjective intent of the fiduciary."[520]

Plaintiffs proved at trial that, in 2018, Stollmeyer was subjectively motivated in large part by his need for liquidity. To recap, by 2018:

- Stollmeyer had never experienced a big liquidity event.[521]

---

[518] Dismissal Decision at *15 (cleaned up) (collecting cases).

[519] *Id.* (cleaned up) (collecting cases).

[520] *Id.* at *16 (cleaned up) (collecting cases).

[521] JX-1337 at 10 ("[F]or the entrepreneur or particularly for the CEO, [an IPO] is not a liquidity event.").

87

- He had made substantial financial commitments by investing, loaning, or pledging: (i) nearly $1 million into his wife's wellness company, (ii) $300,000 into "Stollmeyer Technologies, LLC," (iii) money to his brother and his former business partner for their own real estate purchases, and (iv) $3 million to a local college, of which $2.4 million was unpaid.[522]

- He openly and unapologetically described his unhappiness with his pre-Merger financial situation in a post-merger interview for Cremades's "dealmakers" podcast, stating how "98% of his net worth" had been "locked inside" "extremely volatile" Mindbody stock, and when he faced the expense of "kids in college," he regularly sold "tiny bits" of his stake in the public market under his 10b5-1 plan.[523]

- He described sales made pursuant to his 10b5-1 plan as "kind of like sucking through a very small straw."[524]

- He emailed his financial advisor to ask that he "estimate my cash position" in light of his impending expenses, stating that the timing and amount of his 10b5-1 sales were "top of mind" because of "greater than expected H1 cash outlays[.]"[525]

- His spending required him to "dig[] into his LOC [line of credit]" to fund additional financial commitments.[526]

- He described his pre-Merger financial position in his book as the "living at or near the precipice of financial ruin," and he further wrote that, post-Merger, "my family and I don't have to worry about money anymore."[527]

Plaintiffs further proved that Stollmeyer became uniquely smitten with Vista before the formal sale process began. To recap:

- Stollmeyer met with Qatalyst's Chang on August 7, and although Stollmeyer "had never been open-minded to having dialogue" with private equity before

---

[522] JX-1142; Defs.' Demonstrative 12 at 1–2.

[523] JX-1337 at 10.

[524] *Id.*

[525] JX-145 at 1.

[526] *Id.*

[527] JX-1647 at 181.

that time, his posture had changed by that point, and he was "more open to having a dialogue" with private equity firms.[528]

- Chang connected Stollmeyer to Saroya immediately after the meeting,[529] and Stollmeyer met with Vista on September 4.[530] Chang waited a week to connect Stollmeyer with other private equity firms,[531] and Stollmeyer did not meet with those firms until mid-October and early November.[532]

- Chang reported internally that Stollmeyer had "talked about how he is tired of being public and wanted me to re-connect him w[ith] Vista and Thoma. Probably a 2019 deal is my guess."[533]

- During the September 4 meeting, Stollmeyer told Vista that he was looking to "find a good home for his company" and that he was "getting tired" but did still expect to "stay in his seat 2-3 more years."[534]

- Stollmeyer attended the CXO Summit, where he saw presentations from Vista leadership about the wealth of portfolio company CEOs. Stollmeyer described the presentations as "very impressive"[535] and "mind blowing/inspiring."[536]

- Stollmeyer sent a colleague "money shots," from the Vista presentation,[537] two of which focused on Vista's 2016 acquisition of Marketo for $1.8 billion and subsequent sale of Marketo in 2018 for $4.75 billion.[538]

---

[528] Trial Tr. at 255:22–257:1 (Chang).

[529] JX-230.

[530] JX-264; JX-277.

[531] JX-238; JX-239.

[532] JX-566; *see also* JX-317; Stollmeyer Dep. Tr. at 292:18–293:2.

[533] JX-231 at 1; Trial Tr. at 374:18–376:13 (Stollmeyer) (stating that "maybe I was conveying that with my body language. It was a really tough and challenging time for me personally, wearing both hats of CEO and CTO and trying to find our new CTO").

[534] JX-277.

[535] JX-327.

[536] JX-328.

[537] JX-333.

[538] JX-334; JX-335; *see also* Stollmeyer Dep. Tr. at 364:5–366:14.

- Stollmeyer pitched Mindbody to Vista during the CXO Summit,[539] asked Vista to put him in touch with a founder who had sold to Vista,[540] and gave Vista the impression that he was "hyper focused on maintaining culture and ensuring his business finds the right home that will accelerate growth, not cause it to falter."[541]

- Stollmeyer told Mansbach after the CXO Summit that Vista "really love[s] me, I love them."[542]

- Vista understood that they had largely sold Stollmeyer on a transaction, touting internally that Stollmeyer "loved" them and that they "have built a strong relationship with [Stollmeyer]."[543]

- After meeting his interactions with Vista, Stollmeyer saw Vista as "his solution."[544] He could keep his position as CEO, reload with equity, and participate in a follow-on sale.[545] Stollmeyer told his financial advisor that "he could make as much money over the next three years as he did the first go around."[546]

Moreover, Plaintiffs proved that timing was an issue for Stollmeyer. In 2018, he needed liquidity, was tired of running a public company, and had a relatively limited window for effectuating a transaction. He knew that it was advantageous to before the sunset of the super-voting shares loomed. It would also be easier to sell while Liaw remained on the Board, and before Luxor, who had told Stollmeyer it would oppose a sale of Mindbody, joined. Topping things off, Qatalyst cautioned Stollmeyer on October 11,

---

[539] Trial Tr. at 389:20–390:23 (Stollmeyer).

[540] JX-344; *see also* Stollmeyer Dep. Tr. at 384:9–385:21.

[541] JX-344.

[542] Stollmeyer Dep. Tr. at 326:8–328:12.

[543] JX-350; JX-372.

[544] Trial Tr. at 183:5-11 (Handler).

[545] *Id.* at 72:18–74:6 (Friedman).

[546] JX-1262.

2018, to be careful providing non-public information to Vista because they liked to move fast. For Stollmeyer, that was a plus. Rather than taking steps to slow Vista down, he helped them get ahead.

In response to this compelling factual record, Defendants beat on the same dead horse that they championed at the dismissal stage. They argue that because of his large stock holdings, Stollmeyer's interests had to be aligned with the stockholders as a whole. It is true "that material amounts of stock ownership can serve to align the interests of fiduciaries with the interests of other stockholders."[547] But that does not mean that owning material amounts always align the interests of a fiduciary with the interest of the other stockholders.

In this case, Stollmeyer's stock ownership did not result in fully aligned interests. Defendants' mathematical argument assumes, counterfactually, that Stollmeyer valued the immediate incremental dollar value per share in a sale over everything else. It ignores Stollmeyer's craving for a liquidity event, his fear of near-term market risk, and the upside Stollmeyer expected to capture under Vista ownership. Defendants' counterfactual theory requires the court to ignore everything Stollmeyer said and did.

The record overwhelmingly supports Plaintiffs' theory. To sum it up, Stollmeyer wanted to sell for idiosyncratic reasons. He wanted to sell fast to a "good home" sheltered from the pressures of being a public company. He wanted both near-term liquidity and a

---

[547] Dismissal Decision at *14 (collecting cases).

potential for post-closing upside. And Vista offered all of this. He said it best himself: He loved Vista, and they loved him.

### b. Stollmeyer Tilted The Sale Process In Vista's Favor.

Plaintiffs proved that Stollmeyer created advantages for Vista in the sale process. The record is riddled with instances when Stollmeyer tilted the playing field in Vista's favor.

Stollmeyer did not have Board authorization to explore a sale of Mindbody until mid-October 2018.[548] Before then, he met twice with Vista and signaled that Mindbody could be an acquisition target. During his first meeting with Vista on September 4, Stollmeyer said that he "would like to find a good home for his company."[549] Stollmeyer then pitched Mindbody to Vista during the CXO Summit on October 9.[550] After the summit, Vista had the impression that Stollmeyer "is hyper focused on maintaining culture and ensuring his business finds the right home that will accelerate growth, not cause it to falter."[551] Vista immediately began drafting a memorandum for its Investment Committee and preparing its expression of interest.[552]

---

[548] Trial Tr. at 538:18–22 (Stollmeyer).

[549] JX-277.

[550] Trial Tr. at 389:20–390:23 (Stollmeyer).

[551] JX-344.

[552] JX-1461 at 1.

At least by October 11, Stollmeyer knew that Vista might attempt to move fast to gain a competitive advantage.[553] Rather than slowing Vista down, Stollmeyer helped Vista get ahead. After receiving Vista's expression of interest on October 15, Stollmeyer took his time telling his fellow directors. He informed management on October 17, but he swore them to secrecy.[554] He informed Liaw on October 18. He called Vista's references on October 19. It was not until October 23 that Stollmeyer informed the other directors through a series of individual conversations that let him control the message.[555] During the same period, his conversations with Vista were "progressing rapidly."[556] By delaying before informing the Board, Stollmeyer postponed the formal commencement of a sale process and gave Vista a head start.

Vista used that head start to rev up its process. Vista knew that Stollmeyer was looking for a good home for his company, was a willing seller, and had contacted Vista's references.[557] Based on that information, Saroya authorized retaining Bain to prepare an "outside-in" market analysis of Mindbody that would take four to six weeks to complete.[558] By starting the process in mid-October, Vista was positioned to make a firm offer in early

---

[553] Trial Tr. at 545:14–18 (Chang).

[554] JX-410 at 1.

[555] *See Weinberger*, 457 A.2d at 711–12.

[556] JX-410 at 1.

[557] JX-421 (Saroya: "Yup, I was aware.").

[558] JX-681.

December.[559] None of the strategic bidders so much as heard about the process until November 19. No other financial bidders were contacted until December 3 and 4.

The skewed sale process had an obvious effect. When Vista was ready to make a firm offer in early December, the other bidders were still in the early stages.[560] By December 20, only Vista and H&F remained in the process.[561] Vista made its "best and final" offer on December 20.[562] When Qatalyst tried to prompt H&F to bid, H&F lamented internally that they needed more time.[563]

Stollmeyer was unabashed in his preference for Vista. After the Transaction Committee adopted the Guidelines requiring management to obtain "authorization for outbound communications to potential strategic parties or financial advisors," Stollmeyer made an unauthorized call to Vista to tip them that Mindbody would be commencing a formal sale process.[564] He later entertained an invitation to attend a Vista-sponsored charity event, thinking he would "show a little leg."[565] Meanwhile, he rejected bidders that he disliked for personal reasons.[566]

---

[559] JX-825.

[560] JX-876 at 1 (Qatalyst employee emailing Chang on December 19 that Thoma Bravo was "just much further behind in their thinking . . . . Level of questions is much more basic so far"); JX-877 (Recruit still early in diligence by the time Vista had made an offer).

[561] JX-886 at 3.

[562] JX-917.

[563] JX-951 ("[W]e are processing, need 2 more weeks to sign.").

[564] Stollmeyer Dep. Tr. at 626:12–23; JX-487.

[565] JX-552.

[566] JX-670; JX-671; Trial Tr. at 72:18–74:6 (Friedman).

Stollmeyer did not tell other bidders in September that he was looking for a good home for his company. Stollmeyer did not check other bidders' references in October. Stollmeyer did not tip other bidders in November that Mindbody was commencing a formal sale process. Stollmeyer did not breach the Guidelines to communicate with other bidders. Stollmeyer did not suggest showing other bidders "a little leg."[567] No other bidder knew that Stollmeyer had a deal price bogey of $40 per share. No other bidder knew to get approval to bid up to $40 per share. No other bidder could say "[w]e were able to conduct all of our outside-in work *before the process launched*."[568] No other bidder was able "to move swiftly in the process to provide the MINDBODY Board with a highly certain offer within 3 days of receiving data room access."[569]

Chang warned Stollmeyer that "[t]he more [that Vista personnel] think or feel you're in their camp, the less $ they'll pay."[570] And that is what happened. Vista had the authority from the Investment Committee to pay up to $40 per share, but it had no reason to get there. Without competitive pressure, the Company had no leverage to extract a higher price. Vista ended up paying $36.50 per share, less than the midpoint of their range and below the predictions of the most knowledgeable deal-team members. Without Stollmeyer's help, Vista would not have gotten the Company for $36.50 per share.

---

[567] JX-552.

[568] JX-968.

[569] *Id.*

[570] JX-617.

###### c. The Board Process

Directors can manage conflicts if they are aware of them. The Mindbody Board did not know about the conflicts that infected the sale process. Not surprisingly, the Board did not manage them effectively.

To recap:

- The Board did not know about Stollmeyer's need for liquidity or IVP's desire for a near-term exit their Mindbody investment.

- The Board did not know the details of Stollmeyer's September 5 meeting with Vista.

- The Board did not know that Stollmeyer found the presentations at the CXO Summit to be "mind blowing/inspiring."[571]

- The Board did not know that during the CXO Summit, Stollmeyer told Vista that he wanted to find a home for his Company.

- The Board did not know that after the CXO Summit, Stollmeyer felt that the Vista team "really love[s] me, I love them."[572]

- The Board did not know that Stollmeyer checked Vista's references before informing the majority of the Board of Vista's expression of interest.

- The Board did not know that Qatalyst leaked Stollmeyer's "40 min" price.

- The Board did not know that Stollmeyer had tipped Vista about the start of the formal sale process.

- The Board did not know that Stollmeyer wanted to "show a little leg" to encourage Vista.[573]

- The Board did not know of Vista's huge head start.

---

[571] JX-328.

[572] Stollmeyer Dep. Tr. at 326:8–328:12.

[573] JX-552.

96

In short, the Board was in the dark. Stollmeyer's actions deprived the Board of the information needed to employ a reasonable decision-making process. Given the Board's lack of knowledge, Stollmeyer cannot rely on the Board's actions to support the reasonableness of the sale process or the ultimate outcome.

### 2.     *Corwin* Cleansing And The Disclosure Claim

When enhanced scrutiny under *Revlon* is the presumptive standard of review, a defendant can restore the business judgment rule through *Corwin* cleansing by demonstrating that the transaction was "approved by a fully informed, uncoerced majority of the disinterested stockholders."[574] Ordinarily, the directors bear the burden of proof at trial to establish *Corwin* cleansing. For the reasons already discussed, the court has allocated the burden to Plaintiffs to establish a disclosure violation.

In this case, the stockholders were as in the dark as the Board. Generally, when a plaintiff proves the paradigmatic *Revlon* claim, a defendant will not be able to show that the stockholder vote was fully informed, precisely because the Board did not know about and could not disclose information about the officer's machinations.[575] This generalization plays out here. The stockholders were not made aware of Stollmeyer's conflicts or the way in which the process favored Vista. This is more than sufficient to defeat a *Corwin* defense. The *Corwin* analysis could end here. Because, however, Plaintiffs' disclosure theories are also relevant to the aiding and abetting analysis, a more thorough review is warranted.

---

[574] *Corwin*, 125 A.3d at 305–06.

[575] *See, e.g.*, Dismissal Decision at *26; *Xura*, 2018 WL 6498677, at *12–13; *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 114–15 (Del. Ch. 2007).

Plaintiffs contend that Stollmeyer breached his duty of disclosure by keeping secret his pre-acquisition interactions with Vista (the "process-based disclosures") and by joining Stollmeyer's decision not to disclose the Q4 results before the shareholder vote (the "Q4-results disclosures").

An omitted fact is material where "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[576] To be material, an omitted fact must have "significantly altered the 'total mix' of information made available."[577] When assessing materiality, courts must balance "the benefits of additional disclosures against the risk that insignificant information may dilute potentially valuable information."[578] Although a fiduciary need not give a play-by-play account, "when fiduciaries choose to provide the history of a transaction, they have an obligation to provide shareholders with 'an accurate, full, and fair characterization of those historic events.'"[579]

[576] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[577] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (quoting *TSC Indus.*, 426 U.S. at 449).

[578] *In re Volcano Corp. S'holder Litig.*, 143 A.3d 727, 749 (Del. Ch. 2016); *see also Solomon*, 747 A.2d at 1128 ("The theory goes that there is a risk of information overload such that shareholders' interests are best served by an economy of words rather than an overflow of adjectives and adverbs in solicitation statements.").

[579] *David P. Simonetti Rollover IRA v. Margolis*, 2008 WL 5048692, at *12 (Del. Ch. June 27, 2008) (quoting *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 2007)); *see also Clements v. Rogers*, 790 A.2d 1222, 1242–43 (Del. Ch. 2001) ("In a transaction where the outcome is foreordained by the majority stockholder's voting power and where that voting power precludes the Special Committee from finding other purchasers, the effective functioning of the Special Committee as an informed and aggressive negotiating force is of obvious importance to the public stockholders. When a

"[O]nce defendants travel[] down the road of partial disclosure of the history leading up to the [transaction] …, they ha[ve] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events."[580]

A violation of the duty of disclosure can implicate the duties of either loyalty or care. A "violation of the duty of loyalty is implicated where the required disclosure was made in 'bad faith, knowingly or intentionally.'"[581] For a non-exculpated officer like Stollmeyer, liability can be premised on gross negligence.[582]

Stollmeyer read the definitive proxy and the Supplemental Disclosures before they were filed, and he signed the Proxy Materials as CEO.[583] He was also in a unique position of informational asymmetry at the time of the stockholder vote, as only he and Vista employees knew of the nature and even existence of some of their interactions leading up

Proxy Statement details the functioning of that process, it must do so in a fair and balanced manner that does not create a materially misleading impression of how the Committee actually operated in fact.") (citations omitted).

[580] *Arnold*, 650 A.2d at 1280.

[581] *Crescent/Mch I P'rs, L.P. v. Turner*, 846 A.2d 963, 987 (Del. Ch. 2000) (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 915 (1999)).

[582] *See Harcum v. Lovoi*, 2022 WL 29695, at *27 (Del. Ch. Jan. 3, 2022) ("As discussed above, the Complaint does not state a claim that the Proxy contained material omissions or inaccurate disclosures. Even if any of the alleged omissions or inaccurate disclosures were material, I am not persuaded that they were the product of gross negligence on the part of [individual defendants] in their capacities as officers of the Company."); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *66 (Del. Ch. May 6, 2021) ("An officer's compliance with the duty of care is evaluated for gross negligence."); *In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *15 (Del. Ch. Oct. 27, 2020) ("Under Delaware law, the standard of care applicable to the fiduciary duty of care of an officer is gross negligence.").

[583] JX-1138 at 183; Trial Tr. at 466:11–20 (Stollmeyer).

to the Merger. Stollmeyer knowingly withheld information from the stockholders by painting his interactions with Vista in a sterile light. The sterilized narrative begins with Stollmeyer's September 4 meeting with Stahl and Saroya. The Supplemental Disclosures state that

> a representative of Vista emailed Stollmeyer, offering to meet for lunch, which took place on September 4, 2018, and at which Mr. Stollmeyer provided the representative of Vista with a general overview of MINDBODY and its approach to the fitness beauty and wellness services industries as was typical for Mr. Stollmeyer to present to potential investors.[584]

It is true that Stollmeyer met with Vista on September 4. The Supplemental Disclosures fail to state that Stollmeyer invited discussions about an acquisition by saying he wanted to find a "good home" for his company, that he was "getting tired," and that he expected to "stay in his seat 2–3 more years."[585] Contrary to the disclosure, the meeting was not "typical" for Stollmeyer—he did not provide this information to any other potential acquirers in August, September, or October 2018.[586]

The Supplemental Disclosures next describe Stollmeyer's attendance at the CXO Summit as if it were a run-of-the-mill industry gathering.

> In October 2018, at that "meet and greet" annual conference hosted by Vista, at which Mr. Stollmeyer was present as an attendee on October 8th and 9th, representatives of Vista and Mr. Stollmeyer discussed Vista's investment strategy and the

---

[584] JX-1195 at 4.

[585] JX-277.

[586] Trial Tr. at 525:8–526:11 (Stollmeyer).

firm's interest in learning more about MINDBODY's approach to the fitness, beauty and wellness services industries.[587]

The disclosure omits that during the CXO Summit, Stollmeyer reiterated his intention to explore a sale of Mindbody,[588] without any Board authorization to do so.[589]

The Supplemental Disclosures also provide an anodyne description of Vista's October 15 expression of interest, stating only that "Vista indicated to Mr. Stollmeyer that it was interested in pursuing strategic transaction discussions with MINDBODY."[590] In reality, Saroya and Stollmeyer spoke for 25 minutes over the phone, and Saroya shared that Vista saw Mindbody's stock price correction as a buying opportunity, was willing to pay a "substantial premium" to Mindbody's then-trading stock price of $33.27 per share, and did not see any need for an "automatic exit" for management.[591]

In addition to the partial disclosures sterilizing the description of Stollmeyer's interactions with Vista, the Proxy Materials are completely silent as to the following events:

- Stollmeyer's reference call with a Vista portfolio CEO on October 19.[592]

- Chang's tip to Vista on November 6 that Stollmeyer wanted $40 per share.[593]

---

[587] JX-1195 at 4.

[588] JX-1461 at 1.

[589] Trial Tr. at 538:18–22 (Stollmeyer).

[590] JX-1195 at 4.

[591] JX-410 at 1.

[592] JX-1442; Trial Tr. at 543:10–19, 559:3–6 (Stollmeyer).

[593] JX-533.

101

- Stollmeyer's call to Saroya on November 10, in violation of the Guidelines, tipping him that Mindbody would be running a sale process.[594]

- Saroya's invitation for Stollmeyer to attend a charity event in Miami, and Stollmeyer's initial acceptance as long as he could bring his wife.[595]

The Proxy Materials create a false narrative in which Stollmeyer met casually with Vista on September 4 and October 9, Vista expressed general interest in a transaction on October 15, and then Vista learned of the formal sale process with other potential acquirers on November 30. This is not an "accurate, full and fair characterization" of those events.[596]

Perhaps one of these disclosure issues, standing alone, would not meet the materiality standard. Taken together, however, the partial and complete omissions altered the total mix of information available to Mindbody's stockholders. Plaintiffs proved that Stollmeyer breached his fiduciary duties in the process-based disclosures.

Because the Plaintiffs proved one disclosure violation, this decision does not rule on the Q4-results disclosure.

## B. The Claims Against Vista

Plaintiffs advance two theories of liability for aiding and abetting against Vista. They first argue that Vista aided and abetted Stollmeyer's sale-process breaches, but that claim is procedurally improper. The viability of Plaintiffs' claim against Vista turns on whether Vista aided and abetted the disclosure violations, which it did.

---

[594] Stollmeyer Dep. Tr. at 626:12–23.

[595] JX-1490 at 44.

[596] *Arnold*, 650 A.2d at 1280.

102

### 1. The Sale-Process Breaches

In almost three years of litigation and through four iterations of its complaint, including the last version when Vista was added as a party following the conclusion of fact discovery, Plaintiffs never asserted that Vista aided and abetted the sale-process breaches. Vista moved to dismiss Plaintiffs' claims, and the parties fully briefed that motion.[597] Nowhere in the parties' briefing did Plaintiffs raise (or did Vista expressly anticipate Plaintiffs raising) an argument that Vista aided and abetted in the sale-process breaches. Plaintiffs asserted this theory for the first time in post-trial briefing, relying primarily on an oral motion made at the conclusion of trial pursuant to Court of Chancery Rule 15(b).[598]

Whether to permit post-trial amendment is a matter for this court's discretion.[599] The primary consideration "is prejudice to the opposing party."[600] Although not required by law, the court routinely denies parties' attempts to raise new claims in post-trial briefing.[601] In at least two cases, this court has refused to allow a party to assert aiding and

---

[597] Dkt. 342 (Vista's Mot. to Dismiss); Dkt. 343 (Vista's Opening Br. in Support of Mot. to Dismiss); Dkt. 363 (Pls.' Answering Br. in Opposition to Mot. to Dismiss); Dkt. 385 (Vista's Reply Br. in Support of Mot. to Dismiss).

[598] Pls.' Opening Post-Trial Br. at 84 n.480.

[599] *Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.*, 2008 WL 2133417, at *7 (Del. Ch. May 21, 2008) [hereinafter "*Lloyd's*"].

[600] *Id.* at *8.

[601] *See Zhou v. Deng*, 2022 WL 1024809, at *7 (Del. Ch. Apr. 6, 2022) (dismissing newly asserted aiding and abetting claim introduced in post-trial briefing because it was "too late" and the argument was waived); *CanCan Dev., LLC v. Manno*, 2015 WL 3400789, at *22 (Del. Ch. May 27, 2015) (same), *aff'd*, 132 A.3d 750 (Del. 2016); *see also In re Est. of DeGroat*, 2020 WL 2078992, at *26 (Del. Ch. Apr. 30, 2020) (finding that defendant had waived counterclaim by failing to present evidence on the claim at trial and only "referenc[ing] the claim briefly in post-trial briefing").

abetting claims in post-trial briefing.[602]  This general approach derives from the principle that "[p]leadings are intended to provide fair notice to the opposing party of the legal and factual theories and claims to be litigated."[603]

Rule 15(b) authorizes post-trial amendments to the pleadings to conform to issues "tried by express or implied consent of the parties."[604]  It is "designed to cure the situation where the course of the trial departs so materially from the image of the controversy pictured in the pleadings or by the discovery process that it becomes necessary to adjust the pleadings to reflect the case as it actually was litigated in the courtroom."[605]  Implied consent can arise when an opposing party acquiesces to the introduction of evidence that only relates to the unpled issue.[606]  To support a finding of implied consent in this context, "'it must appear that parties understood evidence introduced without objection was aimed at the unpleaded issue.'"[607]

Plaintiffs contend that Vista impliedly consented to amend the pleadings to include a claim that Vista aided and abetted the sale-process breaches by failing to object to Plaintiffs' Rule 15(b) motion at the close of trial, but Plaintiffs did not state the purpose of its motion when raising it.  Rather, Plaintiffs raised its Rule 15(b) motion as "a technical

---

[602] *Zhou*, 2022 WL 1024809, at *7; *CanCan Dev.*, 2015 WL 3400789, at *22.

[603] *Zutrau v. Jansing*, 2014 WL 6901461, at *7 (Del. Ch. Dec. 8, 2014).

[604] Ct. Ch. R. 15(b).

[605] *Lloyd's*, 2008 WL 2133417, at *9 (cleaned up).

[606] *Id.* at *8.

[607] *Id.* at *9 (quoting *Laird v. Buckley*, 539 A.2d 1076, 1080 (Del. 1988)).  It is this jurist's preference to consider motions made under Rule 15(b) in the context of post-trial briefing.

matter."[608] Nor did the court grant the or invite argument when it was raised.[609] The court deferred the issue for post-trial briefing. Vista's silence was not consent.

Vista also did not implicitly consent through its actions at trial. The evidence Plaintiffs introduced did not speak only to a claim for aiding and abetting. All of the evidence also related to the sale-process claim against Stollmeyer.[610] The evidence did not suggest a new claim, so Vista had no reason to object.

Allowing an amendment at this stage would impose substantial prejudice on Vista. Neither party raised the claim in their pre-trial briefs.[611] Vista had no reason to mount a defense to the claim at trial.

Plaintiffs argue that they alerted Vista to the potential claim by identifying the following as an open issue of law and fact that remains to be litigated in the pre-trial order: "Whether Vista aided and abetted the breaches of fiduciary duty by Stollmeyer and/or the other Mindbody directors in approving the Merger, recommending the Merger to Mindbody's stockholders, and seeking stockholder approval of the Merger based on false and misleading disclosures[.]"[612] On different facts, that could be enough to preserve an issue, but not here. Plaintiffs needed to do more to put Vista on notice that it faced a claim for aiding and abetting sale-process breaches. Plaintiffs may not advance that claim.

---

[608] Trial Tr. at 2547:24–2548:6.

[609] *Id.*

[610] Post-Trial Arg. Tr. at 53:3–5.

[611] Dkt. 443 (Pls.' Pre-Trial Br.); Defs.' Pre-Trial Br.

[612] PTO ¶ 133.

Based on Plaintiffs' failure to timely assert its claim, Plaintiffs may not advance a claim for aiding and abetting based on Stollmeyer's sale-process breaches.

### 2. The Disclosure Breaches

In contrast to their failed claim for aiding and abetting sale-process breaches, Plaintiffs proved that Vista aided and abetted disclosure breaches.

To prevail on an aiding and abetting claim after trial, a plaintiff must demonstrate: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . . (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[613] Generally, a plaintiff bears the burden of proving a claim for aiding and abetting.[614]

Of the four elements, the first is not disputed (Stollmeyer was a fiduciary), the second is established (Stollmeyer breached his duty of disclosure), and the fourth (damages) is addressed in the next section. This section focuses on the third element, knowing participation.

"The element of knowing participation involves two concepts: knowledge and participation. To establish knowledge, 'the plaintiff must demonstrate that the aider and

---

[613] *Malpiede*, 780 A.2d at 1096.

[614] *In re Rural Metro Corp.*, 88 A.3d at 85 & n.11 (collecting cases). The second element of a claim for aiding and abetting—a fiduciary breach—presents a recurring exception to the general rule of burden allocation. Often, the burden of proof for the predicate claim of breach shifts to the defendant fiduciaries. For example, under enhanced scrutiny, the defendant fiduciaries bear the burden of proving the absence of a fiduciary breach. If the claims against the fiduciaries are tried and the fiduciaries fail to satisfy their burden, then the finding of breach applies to the aiding and abetting claim. The court need not re-analyze the claim for fiduciary breach with the plaintiff bearing the burden of proof.

106

abettor had actual or constructive knowledge that their conduct was legally improper.'"[615] The standard for knowing participation is "stringent" and "turn[s] on proof of scienter."[616] "'[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to prove.'"[617]  "[T]he question of whether a defendant acted with scienter is a factual determination."[618]

Vista knew that the Proxy Materials omitted the pre-process disclosures.  Vista knew that Stollmeyer had said on September 4 that he was tired and looking for a "good home" for his company.  Vista knew that Stollmeyer reiterated his intention to explore a take-private at the CXO Summit.  Vista knew that its expression of interest to Stollmeyer contemplated a price based on a premium over market and envisioned retaining some members of management.  Vista knew that Stollmeyer called one of its portfolio company CEOs as a reference. Vista knew that Chang had tipped them on November 6 about Stollmeyer's minimum price of $40 per share.  Vista knew that Stollmeyer had tipped them on November 10 about the timing of the sale process.  Vista knew that on November 17, Saroya had invited Stollmeyer to a charity event in Miami.  Other than Stollmeyer (and on some issues, Chang), Vista was the *only* party who knew this information.

Vista knew the significance of the information that was omitted from the Proxy Materials. Vista scrubbed the same incriminating information from the Investment

---

[615] *Presidio*, 251 A.3d at 275 (quoting *RBC*, 129 A.3d at 862).

[616] *Id.*

[617] *Id.* (quoting *RBC*, 129 A.3d at 865–66).

[618] *RBC*, 129 A.3d at 862.

Committee materials. Stahl texted Klomhaus before the Investment Committee meeting to remind him, "dont tell them about process."[619] Vista changed the slide deck to omit the statement that "Qatalyst Partners call[ed] Vista to indicate that Mindbody will come to market" in late October 2018[620] and falsely assert that Vista was not contacted about a potential sale until November 30.[621] Vista changed the deal-team memorandum to omit an entire paragraph about Stollmeyer's interactions with Vista from August through November, including Stollmeyer "reiterating" at the CXO "his intention to explore a take-private for Mindbody."[622] Stahl later texted Saroya after Mindbody filed its preliminary proxy statement to remind him to stick to this story that "Jeff called you on 11/30 inviting us into the process."[623] Vista hid these details precisely because they did not reflect well on them. This all sheds light on Vista's knowledge.

Plaintiffs also proved that Vista participated in the breach. "For purposes of a board decision, the requirement of participation can be established if the third party 'participated in the board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue.'"[624] "Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and

---

[619] JX-758.

[620] JX-739 at 6.

[621] JX-781 at 7.

[622] *Compare* JX-1461 at 1, *with* JX-1462 at 1.

[623] JX-1066.

[624] *In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *48 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019) (quoting *Malpiede*, 780 A.2d at 1098).

consequential culpability, the element of 'knowing participation' requires that the secondary actor have provided 'substantial assistance' to the primary violator."[625]

The Merger Agreement introduced a contractual obligation for Vista to correct any material omissions in the Proxy Materials. The Merger Agreement mandates that Mindbody "may not file the Proxy Statement or any Other Required Company Filing with the SEC without first providing [Vista] and its counsel a reasonable opportunity to review and comment thereon[.]"[626] If Vista discovered that any information omitted from the Proxy Materials would result in a materially misleading disclosure, the Merger Agreement obligated Vista to "promptly notify [Mindbody], and an appropriate amendment or supplement to such filing describing such information will be promptly prepared and filed with the SEC."[627]

In accordance with this contractual language, Vista had multiple opportunities to review the Proxy Materials. Saroya, Stahl, and Klomhaus routinely received copies of Mindbody's proposed disclosures before filing. Saroya and Stahl both reviewed the preliminary proxy statement on January 5, and both approved the proposed language.[628] Stahl and Klomhaus both received and reviewed the definitive proxy statement on January

---

[625] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 15, 2015) (quoting *Kuhns v. Bruce A. Hiler Delaware QPRT*, 2014 WL 1292860, at *21 (Del. Ch. Mar. 13, 2014)).

[626] JX-1138 at 157.

[627] *Id.* at 158.

[628] JX-1044.

21, and neither suggested any changes to the disclosures.[629] Vista participated in the drafting of the Proxy Materials.

This court has described "an aiding and abetting claim based on a third-party's alleged failure somehow to *prevent* a board from providing misleading disclosures" as "resting on thin ice."[630] Here, the ice is plenty thick. Vista had an obligation to correct the material omissions discussed above and failed to do so. Vista thus withheld information from the stockholders. Vista is liable for aiding and abetting in Stollmeyer's process-based disclosure breaches.

## C.    Damages

"Once a breach has been established, this court's powers are complete to fashion any form of equitable and monetary relief as may be appropriate."[631] "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly."[632] "Damages must be 'logically and reasonably related to the harm or injury for which compensation is being awarded,'"[633] but "[a]s long as there is a basis for an estimate of damages, and the plaintiff has suffered harm, mathematical certainty is not

---

[629] JX-1141.

[630] *Xura*, 2018 WL 6498677, at *15.

[631] *Dole*, 2015 WL 5052214, at *44 (cleaned up).

[632] *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

[633] *Dole*, 2015 WL 5052214, at *44 (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006)).

required."[634] Any uncertainties in calculating damages must be "resolved against the wrongdoer."[635]

Plaintiffs have proven that Stollmeyer breached the duty of loyalty and committed disclosure violations and that Vista aided and abetted in the disclosure violations. They seek transaction damages for their sale-process claim in the amount of $3.50 per share and quasi-appraisal damages for their disclosure claim in the amount of $5.75 per share. In response, Defendants defend the deal price as more than fair and further argue that Plaintiffs' disclosure claims can only generate nominal damages.

### 1. Damages For The Sale-Process Breaches

As a remedy for their sale-process claim, Plaintiffs seek damages from Stollmeyer in the amount that Vista would have paid, which Plaintiffs peg at $40 per share. The lost-transaction theory of damages finds firm footing in Delaware law. As Vice Chancellor Laster has explained:

> When seeking post-closing damages for a breach of fiduciary duty in a sale process, the measure of damages logically depends on what the plaintiffs contend would have happened absent the breach. If the plaintiffs prove that the defendants could have sold the corporation to the same or to a different

---

[634] *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 814 (Del. Ch. 2011) (quoting *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del.2000)); *see also Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prod., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992).

[635] *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 2013); *see also Dole*, 2015 WL 5052214, at *46 (applying wrongdoer rule).

> acquirer for a higher price, *then the measure of damages should be based on the lost transaction price*.[636]

That is true even if the merger price falls within the range of reasonableness. "Factors such as . . . secret conflicts or fraud could lead a court to hold that a transaction that fell within the range of fairness was nevertheless unfair compared to what faithful fiduciaries could have achieved. Under those circumstances, the appropriate remedy can be a 'fairer' price[.]"[637]

In response, Defendants argue the lost transaction price should supply the measure of damages only when a controller sets out to extract value rapaciously from the minority or freezes out "the minority to capture the value of opportunities that the corporation was on the verge of achieving and in which the minority would otherwise have shared."[638] They argue that where, as here, the liable party did not reap the rewards of the lowered deal price directly, the lost transaction price serves as an inequitable measure of damages.

Defendants cite *Reis v. Hazelett Strip-Casting Corp.*, but it does not stand for the limiting principle that they advance.[639] In *Reis*, the court applied entire fairness review to a controller-led reverse stock split under 8 *Del. C.* § 155. In granting relief, the *Reis* court recognized the "remedial breadth afforded by a plenary breach of fiduciary action" and its

---

[636] *PLX*, 2018 WL 5018535, at *51 (emphasis added); *see also Columbia Pipeline*, 2021 WL 772562, at *56 & n.26 (citation and quotation marks omitted) (collecting authorities).

[637] *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *19 (Del. Ch. July 21, 2017) (collecting authorities), *aff'd*, 184 A.3d 1291 (Del. 2018).

[638] *Reis*, 28 A.3d at 467–68; *see also* Defs.' Opening Post-Trial Br. at 100–02.

[639] Defs.' Opening Post-Trial Br. at 100–02.

statement that, "[d]epending on the facts and the nature of the loyalty breach, the answer can be a 'fairer' price."[640]

Defendants do not point to any other authority that would limit the availability of lost-transaction damages to controller transactions. Such a rule ignores the harm to the injured class and would run contrary to the bedrock principle that "[o]nce a breach of duty has been established, this court's 'powers are complete to fashion any form of equitable and monetary relief as may be appropriate.'"[641]

Alternatively, Defendants dispute that Vista would have paid $40 per share. To be clear, the record reflects that Vista had authority to bid *up to* $40 per share, but that does not mean that Vista would have bid that amount. In the Investment Committee materials, $40 was at the highest end of Vista's modeling. Using the same private equity model, H&F saw "no path to $40."[642] If Mindbody had been able to introduce competition, then Vista might have stretched to reach $40 per share, but Vista also could have declined to go that high.

The internal Vista bets provide the most compelling evidence as to what Vista would have paid. Recall that Vista employees, including the deal team members, bet on what the deal price would be in a range of $36.50 (the then-current offer) and $40 (the high-end of

---

[640] *Reis*, 28 A.3d at 467–68.

[641] *Dole*, 2015 WL 5052214, at *44; *see also Thorpe*, 676 A.2d at 445 ("Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.").

[642] JX-951.

the approved range). The line was at $37.50. Over half guessed that the price would be greater than $37.50, and the highest prediction by a deal team member was $38.50/share. Two of Vista's most informed deal team members believed that the deal price was likely to be $37.50.[643] Only one employee, who was not on the deal team, thought that Vista would pay $40.

The evidence demonstrates that Vista would have paid $37.50 had Stollmeyer not corrupted the process. If Mindbody had countered a second time off Vista's $36.50 figure, such as by matching Vista's $1.50 increment and going from $40 to $38.50, then Vista would have made a further move. This would not have been outlandish—Qatalyst's pitch deck showed $38.50 per share as corresponding to the revenue multiple Vista had paid in its Apptio acquisition.[644] Whether Vista split the difference by going straight to $37.50 or engaging in more fractional bidding, the likely result was a deal at $37.50. Plaintiffs are therefore entitled to lost-transaction damages in the amount of $1 per share.

### 2. Damages For The Disclosure Breaches

Plaintiffs seek quasi-appraisal damages on their disclosure claims, which is a measure of compensatory damages. The Delaware Supreme Court has held that when a plaintiff seeks more than nominal damages, the plaintiff must prove "reliance [and] causation."[645] Plaintiffs made no effort to prove either. Plaintiffs therefore are only entitled to nominal damages.

---

[643] JX-883.

[644] JX-593 at 30.

[645] *Dohmen v. Goodman*, 234 A.3d 1161, 1175 (Del. 2020).

In this context, nominal need not be minimal. In *Weinberger*,[646] Chancellor Brown was instructed on remand to award damages for a breach of fiduciary duty where the breach turned on the failure to disclose the substance of the now famous Arledge-Chitea report. Chancellor Brown did not believe the plaintiff class had suffered any compensatory damages, leaving nominal damages as the only possible remedy. He chose to award damages of $1 per share on a deal price of $21 per share, reflecting damages equal to 4.8% of the deal price. He reasoned as follows:

> The approval of the minority secured in the face of the inadequate proxy information enabled [the acquirer] to get what it wanted at the price it wanted to pay, and it seems without question that achieving sole ownership of [the target] has proven quite profitable to [the acquirer]. Under these circumstances, I feel that the minority should be compensated for the wrong done to them even though a damage figure cannot be ascertained from a comparison of selected stock values and hypotheticals with any degree of precision. Quite simply, equity will not suffer a wrong without a remedy.[647]

This court has cited that ruling favorably.[648]

Chancellor Brown derived the $1-per-share remedy by relying upon evidence that, at the time of the merger, a per-share price of $22 rather than the $21 per share actual price would have represented a beneficial deal for the acquirer.[649] The acquirer's expert also

---

[646] 1985 WL 11546, at *9–10.

[647] *Id.*

[648] *See, e.g.*, *Oliver v. Boston Univ.*, 2006 WL 1064169, at *35 (Del. Ch. Apr. 14, 2006) ("Nominal damages of $1.00 per share have been awarded in certain circumstances in which a rational basis can be found in the record for the award.") (citing *Weinberger*, 1985 WL 11546, at *10).

[649] *Weinberger*, 1985 WL 11546, at *10.

conceded that $22 per share would "not have been out of line for the acquisition" and opined that the information available at the time of the merger would have supported a fair price range of $20–22.[650] The award in *Weinberger* thereby approximated a fair division of the merger surplus comparable to what could have been reached if the information had been shared.

Here, as in *Weinberger*, the Company's stockholders were harmed by the inadequate disclosures, which deprived them of a fair opportunity to vote down the Merger. As in *Weinberger*, the precise extent of the harm cannot be established.[651] It is clear, however, that a $1 increase in the per share price would not have rendered the deal undesirable for Vista, nor would it represent a windfall to the class. Based on a deal price of $36.50 per share, an award of $1 per share reflects damages of 2.7%. In these circumstances, a $1-per-share award of nominal damages is appropriate.[652]

### 3. Stollmeyer And Vista Are Jointly And Severally Liable For The Damages Award.

"A defendant who aids and abets a breach of fiduciary duty is jointly and severally liable for the damages resulting from the breach. Under this liability standard, 'the injured

---

[650] *Id.*

[651] *Id.*

[652] This case is distinguishable from another circumstance where the Delaware Supreme Court questioned the rationale behind a $1-per-share award. In *Gaffin v. Teledyne, Inc.*, 611 A.2d 467 (Del. 1992), this court had awarded $1 per share in damages based on *Weinberger* without providing any accompanying evidentiary support. The Supreme Court noted that nothing in the evidentiary record supported the trial court's award. Because the defendant failed to cross-appeal on that issue, however, the award remained intact. *Id.* at 476. By contrast, here there is ample evidence to support the $1-per-share award.

person is entitled to recover his damages from [any] of the tortfeasors, without distinction, subject to the limitation that his total recovery may not exceed the full amount of his damage.'"[653] This decision has already found that Stollmeyer breached his duty of loyalty and duty of disclosure, and that Vista aided and abetted in Stollmeyer's duty of disclosure breach. As a result, Stollmeyer and Vista jointly and severally liable for the damages award of $1 per share.

Only Stollmeyer is liable for the damages award of $1 per share on the sale-process claims. Plaintiffs, however, are not entitled to a double recovery. All that the class can recover is $1 per share.

### D. Interest And Costs

"A successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues."[654] Under Delaware law, where neither party submits evidence showing the appropriate rate of interest, the court typically awards 5% over the Federal Reserve discount rate compounded quarterly. Such an award is appropriate here.

Court of Chancery Rule 54(d) provides that costs "shall be allowed as of course to the prevailing party unless the court otherwise directs."[655] Under Rule 54(d), the

---

[653] *In re Rural Metro Corp. S'holders Litig.*, 102 A.3d 205, 221 (Del. Ch. 2014) (citations omitted) (quoting *Brown v. Comegys*, 500 A.2d 611, 613 (Del. Super. 1985)); *see also Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168, 170 (Del. 1976) ("Persons who knowingly join a fiduciary in an enterprise which constitutes a breach of his fiduciary duty of trust are jointly and severally liable for any injury which results.") (citing *Jackson v. Smith*, 254 U.S. 586 (1921)).

[654] *Summa Corp. v. TransWorld Airlines, Inc.*, 540 A.2d 403, 409 (Del. 1988).

[655] Ct. Ch. R. 54(d).

117

"prevailing" party is a party who successfully prevails on the merits of the main issue or the party who prevailed on most of their claims.[656] Since Plaintiffs have prevailed on their claims against Stollmeyer and Vista in this action, they are entitled to their related costs.

## III. CONCLUSION

Judgment will be entered in Plaintiffs' favor and against Stollmeyer on Count I for breach of fiduciary duty. Judgment will be entered in Plaintiffs' favor and against Vista as to Count II for aiding and abetting breaches of fiduciary duty. Defendants are jointly and severally liable for $1 per share in damages, plus interest and costs consistent with this opinion. The parties shall confer on a form of order implementing this decision.

Plaintiffs' petition for appraisal was litigated in parallel with their breach of fiduciary duty claims. The Delaware Supreme Court has instructed that when a merger gives rise to both a plenary action for breach of fiduciary duty and a statutory appraisal proceeding, the court should rule on the plenary claims first, because a finding of liability and the resultant remedy could moot the appraisal proceeding.[657] "[R]egardless of the Court's substantive findings, the plaintiffs are limited to, and statutorily assured of, a single recovery."[658] This decision therefore does not reach the appraisal claims. The parties shall

---

[656] *Brandin v. Gottlieb*, 2000 WL 1005954, at *27 (Del. Ch. July 13, 2000).

[657] *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1189 (Del.1988).

[658] *Bomarko*, 794 A.2d at 1177.

118

confer and inform the court whether further proceedings to address the appraisal claims are

necessary.[659]

---

[659] *See Dole*, 2015 WL 5052214, at *47 ("It may be that the parties can resolve these issues in the first instance. Rather than burdening an overly long opinion with further analysis of appraisal and its contingent relevance, the parties shall meet and confer about whether further rulings are necessary.").